## Case No. 17,132.

### WALTON et al. v. COULSON.

[1 McLean, 120.][1]

Circuit Court, D. Tennessee. Sept. Term, 1831.[2]

EVIDENCE—PROOF OF ANCIENT DOCUMENTS—SPECIFIC PERFORMANCE — MUTUALITY OF CONTRACT — LIMITATIONS — TRUSTS — EQUITY — DECREES AGAINST INFANTS.

1. An instrument of writing more than forty years old, is not required to be proved with the same strictness as one of modern date, unless there are facts and circumstances proved, which create doubts as to its genuineness. But if these facts and circumstances are explained and refuted by the evidence, then the instrument must be considered as coming under the rule which does not require strict proof of its execution.

2. The relation of vendor and vendee must exist, or the court cannot decree a specific execution of the contract.

[Cited in Fogg v. Price, 145 Mass. 516, 14 N. E. 743.]

3. Where the obligor has an election, the election may be shown by circumstances.

4. Mutuality is essential to the validity of a contract.

[Cited in Tufts v. Tufts, Case No. 14,233.]

5. The statute of limitations does not operate in cases of trust.

6. The rule that chancery will not decree where doubt exists, refers to the intention of the parties from the face of the contract, and not where some doubt may exist as to a certain fact in the cause, however important it may be.

7. Where the relation of trustee and cestui que trust exists on the death of the trustee nothing but the mere legal estate goes to his heirs.

8. A claim to land is not barred by lapse of time, where the right has been asserted at various times and on different occasions, and possession has been taken of a part of the land.

[Cited in Tufts v. Tufts, Case No. 14,233.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 9 Pet. (34 U. S.) 62.]

9. A court of chancery will not decree against infants without full proof, though their guardian ad litem confess the ground of action.

[Cited in brief in Le Bourgeoise v. McNamara, 82 Mo. 190; Ralston v. Lahee, 8 Iowa, 26.]

[This was a bill in equity by Isaac Walton, James Walton, and the heirs of Payne against John Coulson.]

Mr. Fogg, for complainants.

Mr. Washington, for defendant.

McLEAN, Circuit Justice. This controversy arises out of a bond purporting to have been given by Isaac Coulson, the ancestor of the defendant, to Josiah Payne in which he bound himself, his heirs and assigns, to pay to the said Josiah Payne, one hundred pounds, Virginia currency, in payment for a certain horse, twelve months after the date, with lawful interest; otherwise, in lieu thereof, he bound himself to make over all his right and interest of a certain warrant and entry of land of six hundred and forty acres, lying on the north side of Cumberland river, on said river, &c. The bond was dated the 2d January, 1787. As the money was not paid, a bill was filed by the heirs of Payne and Walton, the latter of whom claim to have purchased the land from the heirs of Payne, and they pray that the defendant may be enjoined from prosecuting a judgment in ejectment which he has obtained for the possession of the land, and that he be decreed to convey the legal title to the complainants.

The first point for consideration is, the execution of the bond. It is earnestly contended that the execution of the bond has not been proved, and in the answer as well as in the argument it is insisted that the bond was forged, and that since its supposed execution, it has been so altered as to destroy its validity. There were two subscribing witnesses to the bond, James Donaldson and William Bush. The subscribing witnesses have been long dead, and several witnesses have been examined to prove the hand-writing of Bush, some of whom were his near kinsmen, who had seen him write, and were acquainted with his hand-writing. And, although much evidence has been given by the defendant of a circumstantial character, tending to create some doubts as to the identity of the witness Bush, and, that being a resident of Kentucky, he was not in Tennessee at the time the bond purports to have been executed, yet we think, under the circumstances, the execution of the bond is as satisfactorily proved, as could be expected or should be required after so great a lapse of time. Phil. Ev. 404; Governor v. Cowper, 1 Esp. 275; Fry v. Wood, 1 Selw. N. P. 492; Manby v. Curtis, 1 Price, 232; Bertie v. Beaumont, 2 Price, 308; Bullen v. Michel, Id. 399; 4 Dowl. 297. Strict proof of the execution of an instrument is dispensed with after a great lapse of time, where a person has claimed under such instrument, and there are no circum-

stances which go to create doubts of its genuineness. But in this case, it is contended, there are circumstances which forbid the application of this principle to the bond in controversy. In addition to the proof of the handwriting of Bush, the complainants to sustain the genuineness of the bond have proved by parol the original transaction on which the bond was given, and in which, the terms of the contract as set forth on the face of the bond are proved. The bond appears on its face to have been altered by substituting the state of Virginia, for the state of North Carolina, which has been scratched out; and the signature of the obligor seems also to have been scratched out and re-written. And these alterations, it is contended destroy the validity of the bond. There is no proof that these alterations were made by the obligee, and it is not perceived that he could have had any motive to make them. They do not, in any sense, increase the obligation of the obligor, or tend to advance the interest of the obligee. If the alterations had increased the sum to be paid, or the quantity of acres to be conveyed, or had shortened the time within which the obligation was to be discharged a motive might have been assigned for the alteration, and the part altered being material would have vitiated the bond.

The bond remained in possession of the obligor until his decease, and then came into the possession of his heirs. It appears, however, from the evidence, at one time to have been out of the possession of the complainants, and in the hands of one or more individuals whose interest was hostile to the bond. In the absence of all positive proof on the subject as to the alterations, and being thrown upon the most reasonable presumptions which arise from the facts established, it would seem to be most probable, if the bond has been altered, the alterations as made could not have been made by the obligee or his representatives. They cannot be presumed to have made them, unless we suppose them to have acted not only without any motives of interest, but against all such motives. To presume that these alterations were made by persons whose interests were hostile to the bond, and who had it in possession, would be far less violent. One of the witnesses who saw the bond after the decease of the obligee, states that it was fair upon its face. And we think, the alterations not affecting the obligation of the instrument, and being in some degree accounted for, do not vitiate it; and there is no reason to believe they were made by the complainants or any one claiming under the bond.

The proof of the terms of the contract independent of the bond, is objected to as parol proof going to vary or affect a written instrument. This evidence was not offered to establish the contract, but to rebut the circumstances relied on to destroy its validity. It goes to meet the objection that no such contract was ever made, and that the whole face of the bond is a mere fabrication. It shows

the consideration named in the bond was paid, and this, connected with other circumstances, tends to establish the fairness of the transaction, and raises a probability that the bond was duly executed. At least it rebuts the circumstances relied on as raising a presumption against it, and places it upon the ordinary ground of legal proof. Where the subscribing witnesses to an instrument are dead or their residence is unknown, proof of their hand writing is admissible; and also proof of the hand writing of the obligor. Proof of the hand writing of a witness is not, in reason, as satisfactory proof of the genuineness of an instrument as proof of the signature of the obligor; but by a long established rule of law the former is the higher and better proof, and must be produced. Where any circumstances of suspicion appear upon the face of an instrument, or arise from the evidence, and they remain unexplained, proof of the hand writing of all the witnesses and also some proof of the signature of the obligor might be necessary. But in ordinary cases proof of the signature of one of the subscribing witnesses, the other being dead or absent would be deemed sufficient.

But there is another circumstance in the case, which is strongly in favor of the instrument. This is the lapse of time. On this point it has been contended that lapse of time in favor of a deed only arises where possession accompanies the deed. Ancient deeds are admitted without proof, where the possession is in conformity to the deed. But the presumption is not limited to such cases. It may arise where possession of the deed has been had, by the person claiming under it, and he has done acts, which asserted his claim although he may not have entered into the possession of the land. In the case of Barr v. Gratz, 4 Wheat. [17 U. S.] 231, the supreme court decided "that where a deed is more than thirty years old and is proved to have been in the possession of the lessors of the plaintiff in ejectment, and actually asserted by them as the ground of their title in a chancery suit, it is in the language of the books sufficiently accounted for, and it is admissible in evidence without regular proof of its execution by the subscribing witness." In this case the bond is more than forty years old, and if the obligee did not take possession of the land under the bond, but under a contract made with Coulson, still he claimed the land by virtue of the bond, and exhibited it to Walton and others as the ground of his claim.

Upon a deliberate consideration of the facts and circumstances of the case which bear upon this point, we think the execution of the bond is proved. This may not be clear of all doubt, but the decided preponderance of the evidence is in favor of the instrument, and therefore it is received as genuine. The principle, that where doubt exists, a court of chancery will not decree, does not refer to a particular fact in a cause, but to the terms of the contract. Where these are doubtful, chancery cannot aid.

It will only carry into effect the intention of the parties, and this intention must appear from the contract. In ascertaining the facts of a cause, such as the execution of an instrument, the payment of money &c. the testimony may be weighed and the decision given accordingly.

The next point to be considered is, whether this is such a contract as can be decreed to be specifically executed. Coulson bound himself to pay to Payne one hundred pounds, in Virginia currency, for a bay horse, within twelve months, with lawful interest; otherwise, in lieu thereof, he agreed to make over his title to the land in dispute. The defendant's counsel insist that this is a case of an election by the obligor, and that the contract cannot be specifically enforced, until it be proved that the election has been made. And it is also urged that the conveyance of the land, should be considered in the light of a penalty and was only inserted, as a security for the payment of the money. In giving a construction to instruments, the intention of the parties should be chiefly regarded. The law has fixed certain rules on this subject, which are so generally known, that all persons who are capable of making a contract are presumed to know them.

Chancery will not enforce the payment of a penalty, but will relieve against it. The land in this case was clearly not intended to operate as a penalty or as a security for the payment of the hundred pounds. The intention of the parties is so clearly expressed in the bond, that there is no room for doubt. The obligor bound himself to pay the money or the land at his option, and the obligee agreed to receive either in discharge of the obligation. But at what time may this election be exercised? By the defendant's counsel it is contended that at any time before the expiration of the year, or at the time the bond became payable, it was in the power of Coulson to discharge the bond by the conveyance of the land; but after the expiration of twelve months, Payne was not bound to receive the land, and he could only recover the money. Therefore it is urged there was no sale of the land, and the relation of vendor and vendee does not exist. And that it is only where such a relation exists, a court of chancery can decree a conveyance. On the other side it is urged with equal earnestness, that by the terms of the contract Coulson was bound to convey the land, if he did not pay the money within twelve months. And consequently that an action at law at no time could have been maintained for the money. That the money not being paid within the time stipulated, the bond became absolute for the conveyance of the land and that the land only could be recovered or damages for a failure to convey it. By this construction the obligor would have a reasonable time after the expiration of the twelve months, to make the conveyance, under the rule which allows such time, there being no time fixed by the contract for the conveyance. The obligor agreed to pay the money in twelve months, or in lieu of the money, to transfer the land. This seems to be a clear case of election by the obligor; and a conveyance of the land or the payment of the money would discharge the contract within the time specified. In this respect, there seems to be no difference between the money and the land. If the words of the bond had been that the money was to be paid in twelve months, and in default of such payment, the land was to be conveyed, in satisfaction of the bond, the argument of the complainant's counsel would be conclusive. But the land was to be conveyed in lieu of the money, and not in default of its payment. 2 Story, Eq. Jur. 359; 19 Ves. 662. To have sustained an action at law on the bond, no election having been made, it would have been necessary to aver in the declaration, that neither the money had been paid, nor the land conveyed in discharge of the obligation. If an election had been made, an averment to that effect would have been necessary.

It is alleged in the bill, that the defendant elected to pay the hundred pounds, by a conveyance of the land, and that Payne agreed to receive it. The fact of this election may be established by positive testimony, or by circumstances. No positive proof on this point has been adduced, and the complainants rely on circumstances to show the fact. One of the witnesses states that when Coulson returned to Virginia, he expected to obtain from his father's estate, money, to discharge this debt; but he found that the executor had wasted the estate, and he was, consequently, unable to raise the money. That he remained in Virginia, and was, sometime afterwards, married. It is admitted if the election had been once made, it could not be changed, except by the consent of both parties. The consideration paid for the land by Coulson was the horse he purchased of Payne, and for which it is not pretended payment has been actually made in any other manner Coulson being disappointed in receiving money from his father's estate, as a matter of course would look to the land for the means of payment. This would relieve him from the obligation, and would, in effect, be giving to Payne the proceeds of his own property. It does not appear that Coulson had been subjected to any expense by the purchase of the horse. He had kept him for some months, but the service of the horse was at least worth his keeping. This same horse was disposed of for the land by the act of Payne, as the agent of Coulson. Coulson, therefore, by relinquishing the land for the debt, was in as good a situation as he was before the contract. It seems the horse did not suit him, and he might consider himself fortunate in being able to dispose of him on terms which would relieve him from the debt. This seems to be the natural course of things on the part of Coulson; and from the circumstance of his never taking any step to pay the money or any part of it during his life, and in fact not having the means of paying it; and in addition from the fact that he neither made nor attempted to make any disposition of the land, affords a

strong ground of presumption that it was well understood, as stated by one or more of the witnesses, that if the money was not paid within twelve months the land was to be conveyed. And this presumption is greatly strengthened by the acts of Payne. In his first visit to Virginia, in 1793, which was shortly after the death of Coulson, he endeavored to procure a conveyance of the land, and with the consent of the widow made application to the court for that purpose. And at a subsequent period he complained that he should not be able to procure a title until the heirs of Coulson became of age. He claimed the land and disposed of a part of it before 1798; and actually took possession, and, from that day to this, this right has been asserted by Payne and his heirs, or those who claim under them. It would seem therefore, from the acts of the parties, and the circumstances of the case, that a strong presumption arises that an election to convey the land in discharge of the bond was made. Every equitable consideration favors this presumption. It gives to Payne or his representatives what belongs to them, and takes from Coulson or his heirs nothing that they can call their own. We are satisfied that an election to convey the land was made, and that the relation of vendor and vendee exists in the case.

But it is objected that there is a want of mutuality in this contract for the land, and consequently a specific execution of it cannot be decreed. The doctrine on this head is admitted, but its application is not perceived. In this case the consideration has been paid, and if it be admitted that by the laches of Coulson, if living, he could not compel Payne to receive a conveyance of the land in discharge of the bond, is that any reason why chancery should refuse a specific execution of the contract when claimed by the vendee? This would enable a vendor to defeat any contract, by taking advantage of his own negligence. And this plea might be urged in, perhaps, a majority of the cases where a specific execution is asked. No matter how much the land may be deteriorated in value—though half of it be sunk by an earthquake—after default has been made by the vendor, and in consequence of which it would be an insuperable objection to a specific execution, if made by the vendee, still he may waive this objection and demand a conveyance. If mutuality exist at the inception of the contract, or at the time the contingency happens on which the condition to convey becomes absolute, no subsequent changes can destroy the contract or prevent the vendee from demanding a specific execution of it, if he has performed the condition of it on his part. Sugd. Vend. 194; Attorney General v. Day, 1 Ves. Sr. 218; 10 Ves. 315, 316; 1 Schoales & L. 19, note a.

The statute of limitation, it is insisted, bars the complainant's right. This statute may be pleaded in equity as well as at law. But the question here is, whether the statute can operate in favor of heirs where the specific execution of a contract for the conveyance of land made with the ancestor is the object of the bill. The words of the act of limitation of 1715 are, that "creditors of any deceased person shall make their claim within seven years after the death of the debtor, otherwise such creditor shall be for ever barred." It is contended that Payne could not be viewed in the light of a creditor of the estate of Coulson, in setting up his claim to the land in controversy; that the relation of vendor and vendee exists, and consequently the statute cannot bar the execution of a trust, and could not have been designed to operate in such a case. The first case cited is from Cooke [Tenn.], 330 [Smith v. Hickman's Heirs]. That was a case where Smith filed his bill against Hickman's heirs, stating that the ancestor of the defendant, in 1789, executed an obligation to the defendant, to convey one hundred acres of land, within a reasonable time; that the ancestor died intestate, leaving the defendants his heirs at law; that the obligation has not been complied with, and that the defendants refuse, although a large estate both real and personal has descended to them. In one part of their opinion the court say, "that it has been insisted, that the complainant is not a creditor, on account of the demand not being of a pecuniary nature; but, as it is the duty of this court to examine this point, they feel satisfied that as to that, he is within the act. All persons are considered creditors that have demands originating from contracts or agreements." And the court held that the complainant was barred by the statute. It would seem from the language of the court that they intended to apply the statute to all cases of trusts, as well as to claims for debt or damages, for a breach of contract. But the case before them, was not one where any interest to any particular tract of land vested in the obligee. The obligor agreed to convey six hundred and forty acres of land, "within a reasonable time," but no specific tract was named; consequently the obligee could set up no equitable right to any particular tract of land. No trust was created, and although the bill prayed a specific execution of the contract, no lien existed, and the demand was in effect for damages, if the defendant had no land to convey. That case is not analogous to the one under consideration. And although the language of the court is broad enough to cover cases of trusts, still no case of trust was before them, and consequently they cannot be considered as adjudicating on such a case. The case of Lewis' Ex'rs v. Hickman's Heirs was also cited in the argument. 2 Tenn. [2 Overt.] 317. This was a case where Hickman, for a valuable consideration, executed a bond to John Hughes for £500, with condition, for the conveyance of a tract of two hundred and seventy-four acres of land on Cumberland river, in Davidson county, so soon as Hickman should obtain a patent. A deed was executed by the administrator of Hickman, for this land, but the statute not having been complied with, in making the

·deed, it was inoperative. And the object of the bill was, to set up the original bond against ·the heir. Whether the bill prayed a conveyance of the land, or only the value of it, does not appear in the report. The heirs pleaded the statute, and it was admitted in the discussion that it was a good bar, according to the law as settled in the above case of Smith v. Hickman's Heirs [Cooke (Tenn.) 330]. In a later case (Den v. Mayfield, 5 Hayw. 121) the court say: "As to the act of limitation of 1715 and of 1789, where is the obligee in such a case as the present barred as against the heir? He has no demand against the executor when he selects the land; and cannot therefore be barred as to him. His demand is only against the heir, and that too in equity upon a trust to be performed by the heir; who until performance holds the land for the obligee. And he is only barred as in the case of equities, by the lapse of twenty years unaccounted for." The record which contains the decree in this case has been referred to and examined, and nothing is discovered in it, which controverts the statement of the case in the report. The bill was dismissed because that more than seven years had elapsed from the death of Mayfield before the deed was executed by his personal representative under the statute, when her powers had ceased, and because more than twenty years had elapsed from the execution of said deed to the filing of the bill.

From these decisions it does not appear that the supreme court of Tennessee have decided that the statute operates as a bar to a specific execution of a contract, by an heir, on whom the legal estate has been cast, by the decease of his ancestor. Such a decision would be so novel in its character and injurious in its consequences, that we should require a clear adjudication fixing such a construction of the statute, before we could consider it as the law of this state. Where the relation of trustee and cestui que trust exists, on the death of the trustee nothing but the legal estate descends to the heir. The equity is with the vendee. He has paid the consideration and may be in possession of the premises. Would it not then be a most extraordinary rule, that would bar the equitable claimant from obtaining the legal right. A right divested of all equity. Such a right is not within the mischiefs against which a statute of limitations is designed to guard. After the lapse of seven years the heir is protected against any claim which may be made upon him, as the representative of his ancestors, though he may have inherited from him both real and personal estate. This is the extent, to which the decisions in the above cases have gone. The claims attempted to be enforced, arose from a failure to convey land, but no specific tract of land which the ancestor held in trust for the vendee. In the case against Mayfield the bar rested on the twenty years which had elapsed, and not on the statute of 1715.

That the right asserted by the complainants has been lost by lapse of time, has also been assumed in the defence. But the facts in the case do not sustain this position. Although many years have elapsed from the date of the bond, yet it has not lain dormant. The right under it has been asserted by the complainants and by their ancestor, on various occasions, and especially by entering into the possession of the land.

At the former hearing of this cause, the court intimated that a decree could not be made in favor of the complainants, Waltons, as they had shown no valid contract with the heirs of Payne for the land. That this objection was deemed insuperable so far as the infant heirs of Payne were interested. The bill prays that the title may be decreed to Waltons, on their paying the consideration money, which they had agreed to pay to the heirs of Payne. What this contract was, and how much has been paid upon it, does not satisfactorily appear. But it does appear that the pretended sale by the heirs, was made to Waltons by a person who had no right to dispose of the interest of the heirs, or who was under no legal responsibility to account for the money. The part of it which may have been paid, has probably gone beyond the reach of the infant heirs. And can a case be found where the property of infants has been disposed of under such circumstances, and the proceeding sanctioned afterwards by a court of chancery? But it is said this point is not in issue between the litigant parties. This is true, but the action of the court is prayed upon it, and are we not bound to look into the facts, and see that injustice be not done to those who are incapable of guarding their own interests? So far as the heirs of Payne are of full age, and have assented to the transfer of their rights, to the complainants Waltons, no difficulty exists; but, in regard to the infant heirs, they never having assented to a sale in a legal form, the court can sanction no pretended sale from them. But it is insisted that these infant heirs have recognized the right of the complainants, Waltons, as set forth in the bill. How have they recognized it? By guardians pro forma, to prosecute the suit, and who may be irresponsible and indifferent to their pecuniary interests. Had these infants been made defendants, which would have been the more proper course, had the jurisdiction of the court admitted, the court would hardly have decreed the specific execution of the contract set out in the bill without evidence, although in their answers the guardians might have admitted the facts. The contract of sale to the Waltons is not clear of suspicion, and the proof is deficient if the right of the mother to sell the estate were admitted. A court of chancery will always guard the rights of infants. It will not permit their rights to be sacrificed, by its sanction, though the consent of the guardian be given. Before it divests an estate from infants, and vests it in others, the court must be satisfied that the principles of

justice and the rules of equity authorize the proceeding.

A decree may be entered to invest the complainants Waltons with the legal title to the interest of the heirs of Payne who are of full age, and to invest the legal title in the infant heirs, subject to any equity which may arise under the contract with Waltons.

This case was appealed to the supreme court, and the above decree was affirmed. 9 Pet. [34 U. S.] 62.