BECKER and another vs. CHESTER, Appellant, and GREEN and others, imp., Respondents.

BECKER and another, Appellants, vs. GREEN and others, imp., Respondents.

*April 8—September 23, 1902.*

**(1–3)** *Estates of decedents: Jurisdiction of county and circuit courts.*
**(4–17)** *Suspension of power of alienation: Perpetuities: Trusts and trustees: Power to convert realty into personalty: Equitable conversion: Wills: Construction.* **(18, 19)** *Costs in supreme court when payable out of trust fund: Stipulation.*

1. The jurisdiction of the county court in matters pertaining to the settlement of estates of deceased persons, by the judicial policy of the state grounded on a manifest legislative policy and by express legislative declaration as well, is exclusive, except where the county court cannot afford a remedy as adequate, complete, prompt, or efficient as the circuit court.

2. The judgment of the circuit court on the question of the propriety of its taking jurisdiction of a controversy within the competency of the county court to determine will not be disturbed unless manifestly wrong, the rule being that the former must necessarily be permitted to exercise a broad discretion in deciding the question of its jurisdiction upon the facts of each particular case.

3. Mere economy of time alone is not sufficient to warrant the circuit court in taking jurisdiction of a controversy which is within the jurisdiction of the county court; but such element, with circumstances rendering speedy settlement of the controversy of more than ordinary importance, is sufficient.

4. The primary purpose of the statute limiting the right to suspend the absolute power to alienate realty is not to prevent perpetuities, but to prevent unduly removing property from the field of business transactions. The prevention of perpetuities, so far as accomplished by such statute, is an incidental effect.

5. If realty be conveyed, by will or otherwise, to trustees upon an express trust, with absolute power to convert the same into personalty and hold the equivalent in that form for a period beyond the term for which the absolute power to alienate the realty could be suspended, the trust is valid if, upon such conversion being made, such equivalent will not be fettered by an invalid trust.

Becker v. Chester, 115 Wis. 90.

6. In the circumstances stated in the last paragraph, the fund derived from the realty is not fettered by an invalid trust, in any event, merely by reason of the statutory limitation upon the right to suspend the absolute power to alienate realty. Power being vested in the trustees to convey full title to the realty, satisfies the statute. Upon a conveyance being made, the question of whether the proceeds in the form of personal property are fettered by an invalid trust must be solved by some law governing perpetuities respecting personal property.

7. The power of alienation of realty is not suspended where there are living parties, however numerous, who have unitedly the entire ownership and may, presently, lawfully join in an absolute conveyance of the same.

8. If a testator, in a valid testamentary way, unmistakably directs, either expressly or by necessary implication, that his realty shall be treated in the administration of his estate as personalty, or his personalty as realty, equity will deem that purpose impressed upon his estate immediately upon the taking effect of his will.

9. When the execution of the plan of a testator would be impossible or be attended with such difficulties that it would be unreasonable to suppose that such execution was contemplated by him without converting the realty into personalty or personalty into realty, a direction for such conversion will be deemed imperatively expressed in the will by necessary implication, to the same effect as if expressed therein in words.

10. Whether a will contains, by implication, a direction to convert property from one form into another is to be determined from the will itself, by ordinary rules for the judicial construction of such instruments.

11. A will which requires a large property, consisting partly of real estate and partly of personal property, to be divided into several equal parts or shares, and each part or share to be thereafter, for a long period of years, administered in trust as a separate property, subject to be divided and subdivided into many equal shares or parts before the final closing up of the trust,—the nature of the instrument, independently of the circumstances mentioned, being consistent with or indicating a purpose to have the entire estate treated as personal property,— *held* to impliedly direct the estate to be so treated and to work an equitable conversion of the realty into personalty.

12. The common-law rule as to perpetuities respecting personal property is not in force in this state. CASSODAY, C. J. dissents.

13. The twenty-one year term of the common-law rule respecting perpetuities is an absolute or gross term, not one referable to or subject to be limited by existing infancy.

14. A provision of an express trust of personal property, directing the subject of the trust to be delivered to the beneficiaries at the expiration of lives in being at the creation of the estate and the added common-law period thereafter, does not offend against the common rule of perpetuities if the vesting of the right to the property is not postponed by the terms of the trust to a time beyond such added period.

15. The common rule of perpetuities is satisfied by the vesting of the right to the estate within the limitations thereof, though the beneficiaries may not then be known.

16. Time required after the vesting of the right, for the ascertainment of the person or persons rightfully entitled to the property, does not militate against the validity of the trust in any event, as the rule against perpetuities does not deal with vested estates or interests.

17. A trust does not offend against sec. 2071, Stats. 1898, because of any obscurity which may readily be made certain by some definite test provided therein, when the time shall have arrived for executing the trust in regard to the matters involved.

[Syllabus by MARSHALL, J.]

*On motion to modify judgment:*

18. Taxable costs in the supreme court, payable out of the estate or trust fund, cannot properly be allowed to the losing party in an action which is not, strictly speaking, for the construction of a will or contesting the validity of a will, though the meaning or even the validity of the will may be the vital question involved.

19. A trustee cannot rightfully stipulate for the payment, out of the trust fund under his care, of costs which are not legitimately a charge upon it.

APPEALS from orders of the circuit court for Milwaukee county: EUGENE S. ELLIOTT, Circuit Judge. *Affirmed.*

Action to quiet a controversy as to the legal effect of the will of Sherburn S. Merrill, claimed by plaintiffs to be a suit in effect for the construction of such will. The complaint, by appropriate allegations, shows that all persons interested in the validity of that part of the will called in question are parties plaintiff or defendant. The following matters are also, in effect, alleged therein:

The will was duly established April 21, 1885. Letters testamentary were then issued to the testator's widow, and

*D. C. Green,* B. G. Lennox, and *David S. Wegg,* all of whom
are now in office except Mr. Lennox. The present executors
have in their charge under the sixth clause of the will a fund,
called the widow's fund, of $200,000, a special fund of
$27,500 set aside by them to provide for certain legacies con-
tained in the first five clauses of the will, certain real estate
of which the testator died seised, also personal property of
the value of $621,681.37 which was derived from real estate·
of which he died seised, except $78,975.95 which was derived
from personal property of which he died possessed. All the
persons named in the sixth clause of the will survived the
testator and are now living except his daughter Sarah, who
died testate in 1900, leaving as her only surviving issue
*Sherburn M. Becker.* He and *George C. Markham,* the ad-
ministrator of her estate with the will annexed, are the
plaintiffs in this action. The executors, the testator's daugh-
ter *Marion* and her children, *Sherburn M. Smith, William
M. Chester* and *Norman M. Chester,* the widow, *Mary E.
Merrill,* in her own right, and the testator's sons *Fred F.* and
*Richard,* constitute the defendants.

The first five clauses of the will contain: (1) The usual
provision for the payment of the testator's debts and funeral
expenses; (2) a gift of his homestead and lands used in con-
nection therewith to the widow for life; (3) a gift to her
absolutely of certain personal property in use and for use in
connection with the homestead; (4) a gift to her of $100,000;
(5) a gift to her of the income upon $200,000, said sum to
be set aside and invested by the executors at interest and the
income thereof to be paid to her as directed in the will; (6)
a direction to the executors to pay to the widow, from time
to time, such additional sums of money as they might deem
necessary to enable her to live as she had been accustomed to,
such provisions for her being expressly made to take the
place of dower; (7) a gift of certain real estate to his daugh-
ter *Marion* as the equivalent of a gift made during his life-

time to his daughter Sarah; (8) a direction to the executors to improve such real estate to the extent of $20,000; (9) a direction that the benefits provided for the widow in case she should not survive to take the same, and those provided for *Marion* in a like event and in case she did not survive the testator or leave issue him surviving, to go to the residue of the estate for distribution under the sixth clause of the will, worded as follows:

"All the rest, residue and remainder, of the property, real, personal and mixed of whatsoever kind and wheresoever situate of which I may die seised or possessed, or in any manner entitled unto, including the reversion in my aforesaid homestead and fifteen acres, and the reversion in the aforesaid two hundred thousand dollars, I give, devise and bequeath, in trust, unto my executors, with full power at all times, to lease, or sell and convey the same, or any part thereof, and to convert real estate into personal property or personal property into real estate, as to them may seem best for the interest of all persons concerned, and to make investments in interest-bearing securities, and it is my will that my said executors shall have full power to so manage the property while in their charge, as to make it yield a safe and reasonable income. My estate herein given to my said executors shall be finally disposed of by them as herein directed.

"*First.*—My said executors shall, as soon as convenient after my decease, set apart what in their judgment is equivalent to one fourth of the residuary estate, and they shall pay over from year to year, at the end of each year, the interest or income derived from said one fourth during the preceding year, to my daughter Sarah Merrill Becker, now the wife of Washington Becker, of said city of Milwaukee, so long as she shall live.

"If my said daughter, Sarah Merrill Becker, shall die, leaving no issue her surviving, and at that time my daughter *Marion Merrill* is living or has issue living, and my son *Fred F. Merrill* is living or has issue living, and my son *Richard Merrill* is living or has issue living, then my said executors shall divide the aforesaid one fourth into three equal parts, which shall be added share and share alike, to

the shares herein directed to be set apart for the benefit of my said three children, *Marion Merrill, Fred F. Merrill,* and *Richard Merrill,* and such parts, when so added, shall be disposed of in the manner herein directed for the disposition of the shares to which they are added.

"If my said daughter, Sarah Merrill Becker, shall die leaving no issue her surviving, and at that time either one of my said three children, *Marion Merrill, Fred F. Merrill* and *Richard Merrill,* be dead without issue then living, then and in that event, my said executors shall divide the aforesaid one fourth into two equal parts, which shall be added, share and share alike to the shares herein directed to be set apart for the benefit of my two children who are then living or have issue then living, and such parts, when so added, shall be disposed of in the manner herein directed for the disposition of the shares to which they are added.

"If my said daughter, Sarah Merrill Becker, shall die leaving no issue her surviving, and at that time, any two of my said three children, *Marion Merrill, Fred F. Merrill* and *Richard Merrill,* be dead, without issue then living, then and in that event, the whole of the aforesaid one fourth shall be added to the share set apart for the benefit of that one of my said children who shall then be living or have issue then living, and when so added shall be disposed of in the manner herein directed for the disposition of the share to which it is so added.

"If my said daughter, Sarah Merrill Becker, shall die leaving issue her surviving, then upon her death my said executors shall dispose of one half of the aforesaid one fourth in precisely the same manner as is hereinbefore provided for the disposition of the whole of said one fourth, in the event of the death of my said daughter, Sarah Merrill Becker, without leaving issue her surviving, and if my said daughter, Sarah Merrill Becker, shall die leaving issue her surviving, then upon her death, my said executors shall from year to year, at the end of each year, for the full period of twenty-one years after her death, pay over to such issue, the interest or income derived from the other one half of the aforesaid one fourth during the preceding year, and if such issue shall consist of more than one person, then such payments shall be made, in such proportions, as such issue at the time of each

payment, would be entitled to by descent under the laws of Wisconsin to the real estate of said Sarah Merrill Becker, and at the expiration of said period of twenty-one years after the death of my said daughter, Sarah Merrill Becker, my executors shall pay over or convey to her then living issue, the said one half of the aforesaid one fourth, and if such living issue shall then consist of more than one person, then the said one half of the aforesaid one fourth shall be paid over or conveyed to such issue in such proportions, as such issue would be then entitled by descent under the laws of Wisconsin to the real estate of said Sarah Merrill Becker.

"If my said daughter, Sarah Merrill Becker, shall die leaving issue her surviving, but such issue should become extinct at any time during said period of twenty-one years after her death, or if she leave issue her surviving, but such issue should be extinct at the expiration of said period of twenty-one years, then and on the happening of either of said two contingencies, my said executors shall dispose of said one half of the aforesaid one fourth, in precisely the same manner as is hereinbefore provided for the disposition of the whole of said one fourth in the event of the death of my said daughter, Sarah Merrill Becker, without leaving issue her surviving.

"If my said daughter, Sarah Merrill Becker, shall not survive me nor leave issue, then my said executors shall dispose of the whole of the aforesaid one fourth in precisely the same manner as is hereinbefore provided for the disposition thereof in the event of the death of my said daughter, Sarah Merrill Becker, without leaving issue her surviving.

"*Second.*—[The directions under this head relate to the testator's daughter *Marion,* and are identical with those as to the daughter Sarah.]

"*Third.*—My said executors shall, as soon as convenient after my decease, set apart what in their judgment is equivalent to one fourth of the residuary estate, and they shall pay over, from year to year, at the end of each year, the interest or income derived from said one fourth during the preceding year, to my son *Fred F. Merrill,* until he shall arrive at the age of twenty-one years. When my said son, *Fred F. Merrill,* arrives at the age of twenty-one years, my said executors

shall pay to him, out of said one fourth, the sum of twenty thousand dollars, and from year to year, after my said son, *Fred F. Merrill,* arrives at the age of twenty-one years my said executors shall pay over to him at the end of each year the interest or income derived during the preceding year from the unpaid balance of said one fourth. When my said son, *Fred F. Merrill,* arrives at the age of thirty years, if in the judgment of my said executors his habits and mode of life are such as to render it proper, they shall pay over or convey to him one half of the balance of said one fourth, that may be in their hands; but if his habits and mode of life when he arrives at the said age of thirty years are such as in the judgment of my said executors will render such payment unsafe or improper, then they shall withhold the same until they shall deem such payment prudent; and the entire balance of said one fourth shall be paid over or conveyed to my said son, *Fred F. Merrill,* five years after the last aforesaid payment shall have been made, if in the judgment of my said executors such payment would be proper; but if his habits and mode of life at the expiration of said five years are such as in the judgment of my said executors will render such payment unsafe or improper, then they shall withhold the same until they shall deem such payment prudent.

"*Provided,* that if the conduct of my said son, *Fred F. Merrill,* should be such after he arrives at the age of twenty-one years, as to prevent the payment to him thereafter of anything but interest or income as aforesaid, or only a part of said one fourth, or if he should die before the time or times for the payment of said one fourth should elapse, then upon his death, if he leave issue him surviving, my said executors shall from year to year, at the end of each year, for the full period of twenty-one years after his death, pay over to such issue, the interest or income derived from the balance of said one fourth then remaining in their hands during the preceding year; and if such issue shall consist of more than one person, then such payment shall be made in such proportions, as such issue at the time of each payment would be entitled by descent under the laws of Wisconsin to the real estate of said *Fred F. Merrill,* and at the expiration of said period of twenty-one years after the death of my said son, *Fred F. Merrill,* my said executors shall pay over or convey to his then

living issue the balance of said one fourth then remaining in their hands; and if said living issue shall consist of more than one person, then the said balance of said one fourth shall be paid over or conveyed to such issue, in such proportions, as such issue would be then entitled by descent under the laws of Wisconsin to the real estate of said *Fred F. Merrill.*

"*And further provided,* that if my said son, *Fred F. Merrill,* should die before the time or times for the payment of said one fourth should elapse leaving no issue him surviving; or under the foregoing provisions any part of said one fourth shall remain in the hands of my said executors at the time of the death of my said son, *Fred F. Merrill,* and he shall die without leaving issue him surviving; or if he shall die leaving issue him surviving, but such issue should become extinct at any time during said period of twenty-one years after his death; or if he leave issue him surviving, but such issue shall be extinct at the expiration of said period of twenty-one years, then and on the happening of either of said four contingencies, if my daughter, Sarah Merrill Becker, is then living, or has issue then living, and my daughter, *Marion Merrill,* is then living or has issue then living, and my son, *Richard Merrill,* is then living or has issue then living, my said executors shall divide the aforesaid balance of said one fourth then remaining in their hands, into three equal parts, which shall be added, share and share alike, to the shares herein directed to be set apart for the benefit of my said three children, Sarah Merrill Becker, *Marion Merrill* and *Richard Merrill;* and such parts, when so added, shall be disposed of in the manner herein directed for the disposition of the shares to which they are added; and if on the happening of either of the four aforesaid contingencies either one of my said children, Sarah Merrill Becker, *Marion Merrill* and *Richard Merrill,* be dead without issue then living, then and in that event, my said executors shall divide the aforesaid balance of said one fourth then remaining in their hands into two equal parts, which shall be added, share and share alike, to the shares herein directed to be set apart for the benefit of my two children who are then living or have issue then living; and such parts, when so added, shall be disposed of in the manner herein directed for the disposition of the shares to which they are added; and if on the happening of either of

the four aforesaid contingencies, any two of my said three children, Sarah Merrill Becker, *Marion Merrill* and *Richard Merrill,* be dead without issue then living, the whole of the aforesaid balance then remaining in their hands shall be added to the share set apart for the benefit of that one of my said children who shall then be living or have issue living, and when so added shall be disposed of in the manner herein directed for the disposition of the share to which it is added.

*"Fourth.*—[The directions under this head relate to the testator's son *Richard,* and are the same as those in respect to his son *Fred.*]

*"Fifth.*—If all my aforesaid four children, Sarah Merrill Becker, *Marion Merrill, Fred F. Merrill* and *Richard Merrill,* should die leaving no issue them surviving, or all said issue should become extinct before the trusts herein contained have been executed, then on the happening of such event, I direct my executors to pay over or convey the property then in their hands to my next of kin, in the proportions to which they would be at that time entitled to my estate, by descent, under the laws of Wisconsin."

*Fred F. Merrill* became of age August 1, 1885, and *Richard Merrill* December 27, 1889. The sixth clause of the will offends against the law prohibiting perpetuities and it is therefore void. The property in possession of the executors is held by them upon resulting trusts for those entitled thereto, regardless of the limitations upon the payment or conveyance thereof contained in the sixth clause, and the executors should be required to account for such property so held by them, and required to distribute or convey the property accordingly, taking into account the benefits received under the void express trust. The executors insist upon the validity of the alleged void clause and refuse either to account for and distribute the property held by them, disregarding such clause, or to commence action in some appropriate jurisdiction to have the controversy as to the legal effect thereof determined.

The prayer of the complaint is, in effect, for a construction of the will rendering the sixth clause thereof void as con-

travening the legal prohibitions against perpetuities and for an accounting to them in severalty in respect to the property left by the testator, held by them, as regards the sixth clause of the will, upon resulting trusts, so that the full benefit of one fourth of all the property of which the testator died possessed, not disposed of by the first five clauses of the will and not rendered to his daughter Sarah in her lifetime, should go to them, not disturbing the acts in good faith, of the executors, in administering the estate under the alleged void clause of the will, changing property from one form into another, and, generally, administering the ostensible express trust as if it were a valid provision; and for a proper transfer to plaintiffs of all property found upon such accounting to belong to them.

The defendant *Marion Merrill Chester* answered, substantially repeating the allegations of the complaint, and praying for relief similar to that prayed for by plaintiffs. Defendants *Fred F. Merrill* and *Richard Merrill* demurred to such answer; first, for insufficiency; second, because the claim for relief was barred by the statutes of limitation, particularly subd. 3, sec. 4222, subd. 4, sec. 4221, and secs. 4211, 4212, and 4215, Stats. 1898; third, for want of jurisdiction of the subject of the action. The executors demurred to such answer upon like grounds, and, in addition, because several causes of action were improperly united, and because, if said defendant ever was entitled to the relief prayed for, she had lost that right by laches and abandonment. They demurred to the complaint on the same grounds; and defendant *Mary E. Merrill*, in her own right, separately demurred thereto in substantial harmony with the demurrer of the executors. All the demurrers were sustained. Plaintiffs separately appealed from the orders sustaining the demurrers to the complaint, and defendant *Marion Merrill Chester* separately appealed from the orders sustaining the demurrers to her answer.

For the appellants there were briefs by *Fish, Cary, Upham*

*& Black,* attorneys, and *G. D. Van Dyke,* of counsel, and *Miller, Noyes & Miller,* attorneys for *Marion Merrill Chester;* and the cause was argued orally by *A. L. Cary, G. D. Van Dyke,* and *Geo. P. Miller.* They contended, *inter alia,* that the discretionary power of sale given to the trustees does not render the estate in their hands alienable within the meaning of the statutes, since a sale under that power would not terminate the trust, but would leave the proceeds fettered with the trust until the full expiration of the prescribed period. *Allen v. Allen,* 149 N. Y. 280–288; *Lee v. Tower,* 124 N. Y. 370; *S. C.* 12 N. Y. Supp. 240; *Haynes v. Sherman,* 117 N. Y. 433; *Hobson v. Hale,* 95 N. Y. 609; *Brewer v. Brewer,* 11 Hun, 147; Chaplin, Susp. Pow. Alien. §§ 64, 67, 68, 142, 146, 147, 302, 304, 308–311; 4 Kent, Comm. (Note by Holmes) 283; *Penfield v. Tower,* 1 N. D. 216, 46 N. W. 413; *In re Tower's Estate,* 49 Minn. 371, 52 N. W. 27; *Simpson v. Cook,* 24 Minn. 180; *Atwater v. Russell,* 49 Minn. 57, 51 N. W. 624–629; *Niles v. Mason,* 126 Mich. 482, 85 N. W. 1100; *In re Walkerly,* 108 Cal. 627, 49 Am. St. Rep. 97, 129, 130, 132; *Estate of Hinckley,* 58 Cal. 457, 481; *Ford v. Ford,* 70 Wis. 19, pages 59–61; *Palms v. Palms,* 68 Mich. 385–387; *Fowler v. Ingersoll,* 127 N. Y. 472; *Stoiber v. Stoiber,* 40 App. Div. (N. Y.) 156; *Hawley v. James,* 16 Wend. 61, 163, 164. It is only an unlimited power of sale which in effect determines the trust at the time of sale which removes the restraint. *Fowler v. Ingersoll,* 127 N. Y. 477; *Underwood v. Curtis,* 127 N. Y. 535; *Deegan v. Wade,* 144 N. Y. 576; *Haynes v. Sherman,* 117 N. Y. 433; *Cruikshank v. Home for Friendless,* 113 N. Y. 337; *Robert v. Corning,* 89 N. Y. 225; Bolles, Susp. Pow. Alien. § 68. In order to work an equitable conversion of realty into personalty there must either be a positive *mandatory direction* to sell the real estate and convert it into personalty, or else the will must disclose by necessary implication an intent to convert. A mere *discretionary* power of sale will not work a conversion.

*Dodge v. Williams,* 46 Wis. 97; *De Wolf v. Lawson,* 61 Wis. 469, 478; *Ford v. Ford,* 70 Wis. 19; *McHugh v. McCole,* 97 Wis. 166; *Harrington v. Pier,* 105 Wis. 485; *In re Tatum,* 169 N. Y. 514, 62 N. E. 580; 2 Underhill, Wills, § 697; Page, Wills, §§ 699–704.

*Charles Quarles* and *J. G. Flanders,* of counsel, for the respondent executors.

For the respondent *Mary E. Merrill* there was a brief by *Timlin, Glicksman & Conway,* and oral argument by *W. H. Timlin.*

For the respondents *Fred F. Merrill* and *Richard Merrill* there was a brief by *Ryan, Ogden & Bottum,* and oral argument by *L. M. Ogden.*

The following opinion was filed June 19, 1902:

MARSHALL, J.   This action pertains to the settlement of the estate of Sherburn S. Merrill, deceased.   The county court having jurisdiction of the subject matter thereof had full original jurisdiction to hear all questions and make all orders necessary to a complete adjustment of the rights of all the parties interested.   By a judicial rule, and by statute as well, that jurisdiction was exclusive, precluding the legitimate commencement of this suit in the circuit court unless jurisdiction by the latter court existed under some of the exceptions to such rule.   *Catlin v. Wheeler,* 49 Wis. 507, 5 N. W. 935; *Meyer v. Garthwaite,* 92 Wis. 571, 66 N. W. 704; *Burnham v. Norton,* 100 Wis. 13, 75 N. W. 304; ch. 5, Laws of 1899.   Counsel for appellants claim that the circuit court had jurisdiction, first, because the purpose of the suit was to "construe a will;" second, because the object of the suit, in part, was "to affect or pass the title to real property;" and third, because "the county court could not afford a remedy as adequate, complete, prompt or efficient as the circuit court." We do not deem it necessary to consider any of those grounds of jurisdiction except the last.   Whether this suit can be

sensibly deemed an action to construe a will, when the primary
object thereof is neither that nor one sought to be obtained,
necessarily, by invoking judicial construction of a will, but
rather by a judicial avoidance thereof; and whether it can
reasonably be said that the action is to affect or pass the title
to real estate, when the primary object thereof is manifestly
to charge the executors of the Merrill will as trustees of a
resulting trust, and no effect to pass title by judicial decree
is sought or will probably be necessary in any view of the
case,—is by no means clear.  It seems, however, that it is not
unreasonable to hold that, if appellants have a cause of action
against the executors on the facts alleged, the county court
could not afford a remedy "as adequate, complete, prompt or
efficient as the circuit court."  The quoted language is from
ch. 5, Laws of 1899, which was manifestly intended to put
prior judicial rules on the subject into statute law and furnish
a definite legislative guide in the administration of justice.
In doing so the broadest possible view, so to speak, of the
effect of the decisions of this court, was taken.  The words,
"full and ample relief" used in *Batchelder v. Batchelder,* 20
Wis. 452, "complete and adequate relief" used in *Hawley v.
Tesch,* 72 Wis. 299, 39 N. W. 483, "complete and efficient
relief" used in *Burnham v. Norton,* 100 Wis. 13, 75 N. W.
304, and "practicable, efficient and prompt," used in *Meyer v.
Garthwaite,* 92 Wis. 571, 66 N. W. 704, construing the words
"adequate and complete," and other expressions found in the
cases cited, to the effect that, in special circumstances deemed
sufficient in the sound discretion of the circuit court to war-
rant the use of its original jurisdiction notwithstanding com-
petency of the county court to afford a full and complete
remedy, the jurisdiction of the former is not superseded by
that of the latter (*Willis v. Fox,* 25 Wis. 646), were com-
bined in the legislative enactment with the intention of em-
bodying therein our settled judicial policy.  It is still true,
as said in *Burnham v. Norton,* that much latitude must be

given to the trial court in determining its jurisdiction on the facts of each case as presented, and in instances of doubt as to the rightfulness of its decision such doubt should be resolved in favor thereof. In short, the trial court should be sustained on that point, unless wrong beyond reasonable controversy. Respondents are not in a position, of course, to invoke the full benefit of that rule, because the record does not definitely show whether the trial court decided in favor of its jurisdiction or not. But it is reasonable to infer that such was its decision, inasmuch as leave was granted to amend. That indicates that it was not the judgment of the circuit court that jurisdiction of the subject matter was wanting, and that the demurrers were sustained upon some other ground going to the merits of the litigation. However, we are inclined to so view the case to the extent of not giving effect to the orders appealed from as indicating a considerate determination by the trial court, on the jurisdictional question, adverse to appellants, treating the question of whether there is any infirmity in its jurisdiction, on the facts alleged, very much as an original proposition.

It is said in *Meyer v. Garthwaite* that by the phrase "adequate and complete remedy" is meant a remedy "as practicable and efficient to the ends of justice and its prompt administration as the remedy in equity." That is explained. by saying that the term has reference, among other things, to time and expense. That idea, as we have shown, was embodied in the act of 1899. Probably the mere economy of time in reaching a final result is not sufficient to warrant the circuit court in taking jurisdiction of a matter that can readily be settled in the county court. The element of time, however, is material when, by reason of peculiar circumstances, the speedy settlement of a controversy, that can only be determined by judicial remedies, is rendered of more than ordinary importance. In that view it is provided in the law of 1899, as before indicated, that an executor may be sued in

the circuit court when, notwithstanding the county court can afford a remedy, that remedy is not 'as prompt as the one afforded in the circuit court.' Applying that to the facts of this case, the jurisdiction of the circuit court seems clear. Upon plaintiffs' theory the rightful distribution of the Merrill estate has been delayed for many years. During such delay it has been handled in violation of the legal rights of the heirs, though in the utmost good faith. In the meantime a great property, which upon plaintiffs' theory should, in the main, have gone to the heirs *in specie,* has been changed in form, and many persons have become interested therein who might be injuriously affected if the full legal and equitable rights of the heirs were now insisted upon. The business of administering the estate is of such magnitude and character that it cannot be disturbed for any considerable length of time without prejudice to many persons, regardless of the final outcome of plaintiffs' claim. The settlement of the estate of Sarah Worthing Becker will probably await the outcome of the controversy in question. Looking at all these features, and others that might be pointed to, particularly the amount, kind, and situation of the property, the great length of time the interest therein represented by the plaintiffs has been kept from its rightful owners, if their theory be correct, the complications growing out of past transactions should all the alleged rights be insisted upon, and others that might probably arise by a continuance of the present situation, the length of time that would be required to litigate the questions involved in the county court, without any material progress toward a final settlement of the controversy, because of the number and importance of such questions to be judicially determined,—a strong case is presented, calling for the exercise of original jurisdiction by the circuit court.

If the sixth clause of the will be valid, there is little or no ground for claiming that either the complaint, or the answer of *Marion Merrill Chester,* states a good cause for relief.

Its validity depends on the maintenance of some, and fairly calls for a consideration of all, of the several propositions affirmed by counsel for appellants which we will separately discuss.

Does the sixth clause of the will offend against the statute prohibiting restraints upon the power to alienate real estate? At the outset, on that question, we should look to the statute itself, determine its scope and purpose, and not, as some courts have done, and textwriters as well, assume that the legislative policy embodied therein was intended to be in harmony with the common law on the subject of perpetuities as a whole, and give effect thereto accordingly.

There is much want of harmony in the decisions of courts and the writings of textwriters regarding statutes similar to ours, as to their being aimed, primarily, at the prevention of perpetuities, when, by the plain reading thereof, their object is to prevent restraints upon the power to convey real estate— to prevent absolutely taking the title thereto out of the field of business for a longer period than that named therein. There are two distinct ruling ideas found in the authorities: one, that restraint on the power to alienate realty is primarily to prevent perpetuities, so that, though absolute power to convey the title may rest in persons in being, if the converted fund arising from such conveyance must remain upon trust for a longer term than the power to alienate the realty could lawfully be suspended, the whole scheme offends against the statute; and one that the primary object of the statute is not to prevent the tying up of property in the broad sense of the term, but to prevent unduly suspending the power to absolutely alienate title to realty,—that such power not being restrained in contravention of the express words of the statute, restraint upon the ownership of property, regardless of its form, must depend upon some other provision of law. The dividing line between the two theories, under statutes like ours, would probably always have been distinct and well

recognized if the plain wording thereof had been followed instead of courts endeavoring to give effect thereto in accord with the policy of the common law against perpetuities, from which the statute of New York, and those in whole or in part modeled thereon, including our own, materially differ when compared with the later decisions of the English courts.

Our statutes on the subject under discussion have been modified somewhat since the will was drawn. Sec. 2039, R. S. 1878, was then in force, and is as follows:

"The absolute power of alienation shall not be suspended, by any limitation or condition whatever, for a longer period than during the continuance of two lives in being at the creation of the estate."

If the term "absolute power of alienation" could be considered ambiguous in any view of it, or the purpose of the statute, standing alone, could be reasonably said to aim at the tying up of property in a general sense, in harmony with the common-law doctrine not established in England till 1881, in *London & S. W. R. Co. v. Gomm,* 20 Ch. Div. 562, we would be prevented from adopting it by the legislative exposition of the statute in the following language contained in sec. 2038, R. S. 1878:

"Such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed."

Before the origin of the system in New York, from which our statutes were modeled, as to real estate, these two ideas received attention in the English decisions: first, no future estate in land which can be released is too remote, as regards the land itself, to offend against the law prohibiting perpetuities; second, a future interest in land is too remote notwithstanding the title thereto is not tied up so as to prevent dealing therewith if it be in a trust required to be carried beyond the period of limitation fixed by law, as regards per-

petuities in property. In *Gooch v. Gooch,* 3 De Gex, M. & G. 366, 381, the Lord Chancellor, giving the test to be applied at common law in determining whether the power of alienation is unduly suspended, said that the sole test was whether there were persons in being by whom a fee could be conveyed. *Gilbertson v. Richards,* 4 Hurl. & N. 277; *Birmingham C. Co. v. Cartwright,* 11 Ch. Div. 421; and *Avern v. Lloyd,* L. R. 5 Eq. 383,—are to the same effect. That doctrine can be easily traced back in the judicial history of England to *Washbourn v. Downes,* 1 Cas. Ch. 213, decided in 1672, where this language was used:

"A perpetuity is where, if all that have interest join, and yet cannot bar or pass the estate. But if by the concurrence of all having the estate tail may be barred, it is no perpetuity."

In *London & S. W. R. Co. v. Gomm, supra,* after reviewing the whole field of judicial history from the time of *Washbourn v. Downes,* the conclusion was reached that decisions based thereon were contrary to the true policy of the law and wrong; that restraints upon alienation are aimed primarily at the prevention of perpetuities; that a trust in real estate, tying up the estate itself, may be within the limitations of the rule against perpetuities, notwithstanding there are persons in being competent to convey a full title in possession to the realty. When the view which finds its first definite expression in *Washbourn v. Downes*—that so long as there are persons in being, no matter how numerous they may be, who by joining can convey a full title in possession to the realty, there is no offense against the doctrine of perpetuities—was supposed to be the law of England, the statutes of New York were framed; and that idea was made a part thereof so plainly that there is no good reason for going astray in respect thereto. Mr. Gray, in his work on Perpetuities (sec. 747), while insisting that the doctrine is wrong, states that it has been unmistakably engrafted upon the New York statutes and those

that are modeled thereon. Note the complete harmony between the language of *Washbourn v. Downes* and the statute:

"A perpetuity is where, if all that have interest join, and yet cannot bar or pass the estate. But if by the concurrence of all having the estate tail may be barred, it is no perpetuity."

"Such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed."

The New York courts, before the adoption of its system as regards real estate here, took the view above expressed. *Hawley v. James,* 16 Wend. 176. In *Robert v. Corning,* 89 N. Y. 225, in harmony with a long line of New York decisions, and in treating a situation precisely the same as the one we have here, the following language was used:

"The mere creation of a trust does not, *ipso facto,* suspend the power of alienation. It is only suspended by such a trust where a trust term is created, either expressly or by implication, during the existence of which a sale by the trustee would be in contravention of the trust. Where the trustee is empowered to sell the land without restriction as to time, the power of alienation is not suspended, although the alienation in fact may be postponed by the nonaction of the trustee, or in consequence of a discretion reposed in him by the creator of the trust. The statute of perpetuities is pointed only to the suspension of the power of alienation, and not at all to the time of its actual exercise."

Rightly understood, we venture to say all the New York authorities, with unimportant exceptions, are in harmony with *Robert v. Corning. Norris v. Beyea,* 13 N. Y. 273, 279; *Genet v. Hunt,* 113 N. Y. 158, 172, 21 N. E. 91; *Nellis v. Nellis,* 99 N. Y. 505, 516, 3 N. E. 59; *Gott v. Cook,* 7 Paige, 521; *Williams v. Montgomery,* 148 N. Y. 519, 43 N. E. 57. The early English rule, in almost the exact language used to express it in the cases which were condemned in *London & S.*

*W. R. Co. v. Gomm,* is stated in *Williams v. Montgomery.*
We quote:

"The test of alienability of real or personal property is that
there are persons in being who can give a perfect title. Where
there are living parties who have unitedly the entire right of
ownership, the statute has no application. The ownership is
absolute whether the power to sell resides in one individual or
several. If there is a present right to dispose of the entire
interest, even if its exercise depends upon the consent of many
persons, there is no unlawful suspension of the power of
alienation."

The point is made that so long as there is a trust term in
real estate, with a mere discretionary right to sell which may
or may not be exercised within the limits set by the statute for
the suspension of the absolute power of alienation, the trust
will fail; that to take the case out of the statutory rule, the
exercise of the power of sale must be peremptory; that there
must be persons in being who can compel such exercise within
the statutory period. Bolles, Suspension of Power of Aliena-
tion, § 68, so states the law, but he does not support the
same by any reference to judicial or other authority.
The text is merely the author's view of what the law is or
ought to be. He states, in effect, at sec. 67, that it is not in
harmony, fully, with the language of *Robert v. Corning,* 89
N. Y. 225. He seems to have been governed more by the
general statutory policy of New York as to perpetuities, under
which a trust term in realty with power of sale must be
susceptible of being closed, both as to the realty and the con-
verted funds, within the limitation upon the right to suspend
the absolute power of alienation as to realty, the limitations
being the same as to one kind of property as to the other.

It may well be that, where a limitation is placed by law
upon the right to suspend the absolute power to pass the title
to realty, and also upon the right to tie up the ownership of
personal property, a trust term in the former, with power to
convert the same into the latter, is void if, upon the exercise

of such power, the equivalent of the realty in its new form would be left under an invalid trust. That is the idea which ruled or was present in all the cases upon which counsel rely on the point now under consideration. *Allen v. Allen,* 149 N. Y. 280, 43 N. E. 626; *In re Tower's Estate,* 49 Minn. 371, 52 N. W. 27; *Lee v. Tower,* 124 N. Y. 370, 26 N. E. 943; *Penfield v. Tower,* 1 N. D. 216, 46 N. W. 413; *Niles v. Mason,* 126 Mich. 482, 85 N. W. 1100. True, it was said in *Lee v. Tower,* when decided in the supreme court of New York, the situation being similar to the one presented here, that the result of unduly tying up the estate, in that the converted fund was unduly fettered by the trust, rendered the trust invalid under the statute prohibiting the suspension of the absolute power of alienation. But it seems clear that the real foundation of the decision is that since the prohibition as to the ownership of the converted fund was the same as that in regard to the realty under the New York law, a mere change in the form of the property made no difference in the result. That is obvious, because no attempt was there made, nor when the case was affirmed in the court of appeals, nor has any suggestion been subsequently made in any decision by the New York court, to limit the doctrine clearly stated in *Robert v. Corning.* This subject received consideration in *Palms v. Palms,* 68 Mich. 355, 36 N. W. 419, and if it were not for what is said to be the conclusion there reached, in *Niles v. Mason, supra,* we should unhesitatingly say it was to the effect that so long as power is vested in a trustee of realty at his option to pass the absolute title thereto, there can be no unlawful suspension of the absolute power of alienation in contravention of the statute; that if the converted fund, by the terms of the trust in such a case, is left unduly tied up, the estate being fettered illegally notwithstanding competency to pass the title to the realty, it is because of some law in respect to limitations upon the power to fetter the ownership of personalty. That is in perfect harmony with *Thatcher v.*

*Wardens,* 37 Mich. 264, so far as that case goes. Justice
CHAMPLIN, who dissented from the decision of the court in
the *Palms Case,* did so in the main, we should say, upon the
ground indicated by this language, which we quote from his
opinion:

"I cannot accede to the proposition 'that the absolute power
of alienation is not suspended when the instrument gives the
trustees power to dispose of property at their option. When
power is given to convey the trust estate, the absolute power
of alienation can in no possible way be said to be suspended.'
Doubtless the proposition is true, as applied to the alienation
of any particular property, but it seems the object and pur-
pose of the law was not kept in view in the opinion (speak-
ing of the opinion in *Thatcher v. Wardens*). The fact that
there is a power of sale of the trust property can have no
bearing upon determining the validity of the trust as post-
poning the ultimate vesting of the trust estate in the benefi-
ciary. If the trust estate is tied up longer than the law
allows, it is void."

To fully understand that, it must be kept in mind that
the Michigan statute as to realty is the same as that of this
state, while the common law prevails as to personalty. Jus-
tice CHAMPLIN, it will be seen, treated the common-law rule
against perpetuities and the statute in respect to alienation
as parts of an entire system preventing the tying up of es-
tates, and as if the purpose of every part of the system was
primarily to guard against unduly withdrawing estates from
the beneficiaries. He regarded a trust with power of sale
as invalid, if not subject to be closed till a time subsequent
to that beyond which power to alienate the land held under
the trust could be suspended. His reasoning forms the basis
of the decision in *Niles v. Mason,* 126 Mich. 482, 85 N. W.
1100, repudiating the doctrine that the statute, as to the
alienability of realty, is aimed primarily at the subject ex-
pressed therein, and holding that it goes to the prevention
of the tying up of estates; that an estate in land under a
trust term, with power of sale thereof, is governed by the

statutory limitations upon the suspension of the power of alienation; that there must be not only absolute power to convey the land, but the trust estate—to fully close the trust—to take it out of the statute. Justice CHAMPLIN cited and followed *London & S. W. R. Co. v. Gomm,* 20 Ch. Div. 562, and subsequent English cases, where, as we have seen, the early English doctrine, which became a part of the statute of this state, as it did that of Michigan, was repudiated. The learned justice overlooked, as it seems, the fact that such repudiated doctrine was, *ex industria,* made a part of the statutory system at the time of its origin in New York, when it was supposed to be in accordance with the settled policy of the common law, by the words:

"Such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed."

It is difficult to see why a repudiation of the rule upon which the statute is based is not a judicial nullification of the statute itself. We entertain great respect for the Michigan court, but cannot see our way clear to follow its lead. It seems that if the history of the statute had been fully understood, the court would have considered that the judicial function did not extend so far as to permit it to follow the later English doctrine, and it would have adhered to the decision in *Thatcher v. Wardens,* 37 Mich. 264.

It is considered that the proposition that a trust in land with power of sale may offend against the law prohibiting perpetuities if, upon the execution of the power of sale, the converted fund is left fettered by a trust, is true only in case that trust is invalid—a trust contravening some law on the subject as to the converted fund. *Penfield v. Tower,* 1 N. D. 216, 46 N. W. 413, decided by the supreme court of North Dakota, upon which counsel for appellants rely, is in perfect harmony with that doctrine. In that state there is a statute as to realty similar to ours, and a statute as to per-

sonalty as well, and, in addition, a legislative exposition of such statutes in these words:

"The suspension of all power to alienate the subject of a trust, other than a power to exchange it for other property to be held upon the same trust, · or to sell and invest the proceeds to be held upon the same trust, is a suspension of the power of alienation, within the meaning of section 2717." Sec. 2744, Comp. Laws N. D.

In that situation the court was compelled to hold that absolute power, resting somewhere, to pass a full title in possession to real estate held in trust, will not satisfy the statute prohibiting the suspension of the power to pass the title to the subject of the trust.

The Minnesota statute as to real estate is the same as ours, while as to personalty the common-law rule probably prevails. In *In re Tower's Estate,* 49 Minn. 371, 52 N. W. 27, much discussed in the briefs of counsel, the court held, in harmony with the views we have expressed, that the primary object of the statute is to prevent restraints upon alienation, and, when that is not violated in a trust of realty, the trust is valid unless it unduly suspends the ownership of personal property under the rule on that subject. The court cited and followed *Robert v. Corning,* 89 N. Y. 225, and *Thatcher v. Wardens,* 37 Mich. 264. We can best record here the full scope of the decision by the following quotation from the syllabus written by the court:

"Where a single trust embraces both personal and real property, and it does not offend against the rule as to perpetuities in respect to personalty; and by the instrument creating the trust an unconditional power of sale is given to the trustees, under which they may at any time convey the lands, and the converted fund is subject to a valid trust, the power of alienation is not suspended and the trust is not in contravention of the statute."

That seems to touch this case at all points on the subject under discussion.

What has been said demonstrates, in our judgment, that the question of whether the sixth clause of the will offends against the statutory limitation upon the suspension of the absolute power of alienation must be answered in the negative. The trustees were given the amplest power to sell the real estate or any part of it at any time they might see fit. The absolute power of alienation in respect thereto was not suspended for a moment. Under the terms of the trust the trustees were empowered to sell and convey the realty as fully and absolutely as the creator of the trust might have sold and conveyed the same in his lifetime. We adopt the doctrine that the absolute power of alienation is not suspended within the meaning of the statute so long as absolute power is located somewhere to alienate, regardless of the condition in which the equivalent of the property alienated may be left; that undue suspension of the absolute ownership of an estate is one thing, and unlawful suspension of the power of alienation of real estate is another; that a trust term that does not involve the latter because of its being characterized by a power to convert realty into personalty is valid in any event if, when the power is exercised, such trust does not involve the former; and that, if there is no law as to the former, a trust that does not involve the latter, though it may necessarily continue beyond the statutory period for which the power of alienation of realty under the trust may be suspended, is valid.

Counsel for appellant point to *Ford v. Ford,* 70 Wis. 19, 33 N. W. 188, as significantly out of harmony with the views above expressed. The following language is referred to:

"The necessity of the *corpus* of the estate being held by a trustee during such several periods and awaiting such several contingencies and possibilities, seems to be absolute. Such trustee or executor is directed to sell some lands and buy others, but he has no authority under the will to pervert or alienate any portion of the estate, in contravention of the trust.

In other words, the *corpus* of the estate is inalienable during the continuance of the trust." 70 Wis. 59, 33 N. W. 201.

We perceive no difficulty in that when it is read in connection with the subject to which it relates. The court was talking about restraint upon the power of alienation of realty. The *corpus* of the estate was regarded all the time as composed of realty under the scheme of the will. Since by sec. 2089, R. S. 1878, beneficial interests in a trust for the receipt of rents and profits of land were not assignable, it was said that beneficiaries of such interests could not join with the trustee holding the legal title and pass the title absolutely in possession, and therefore a trust involving such interests, which may or must continue beyond the limit of time for the suspension of the absolute power of alienation, offends against the statute on that subject, and is void. By the terms of the will the property spoken of as the *corpus* of the estate was realty, and made inalienable under any circumstances when sec. 2089, R. S. 1878, was read into the will. In those circumstances, nothing said by the court about the trust being invalid because it tied up the *corpus* of the estate beyond the statutory limitation upon the suspension of the absolute power of alienation as to realty can be legitimately invoked to defeat the trust in question in this case.

There was no equitable conversion of the real estate into personal property. That proposition—though presented for consideration by appellants' counsel and ably discussed in the briefs of counsel upon both sides as one liable to be the vital point in the case—in view of the conclusion we have reached, might be passed over. But it is deemed better to consider and decide it. The general principles to be satisfied in determining whether equitable conversion of personal property into realty or realty into personalty was wrought in any given case, are too well understood to call for any extensive discussion of them. Equity deems that done which ought to be done. Therefore, if a testator, in a valid testa-

mentary way, unmistakably directs, expressly or by unmistakable implication, that his real estate shall be treated in the administration of his estate as personalty, equity will deem that purpose impressed upon the property immediately upon the taking effect of the will, and rules regarding personal property will govern. A mere optional or discretionary purpose to convert—that is, discretionary authority as to whether to convert or not—is not sufficient. There must be a mandatory direction, express or implied, to convert; but the time of the execution of the purpose may be left discretionary. The rule as to when such a direction to convert will be implied is stated in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, and often since affirmed, thus:

"When a will contains a power of sale, not in mandatory terms, but it is apparent, from the general scope and tenor of the will, that the testator intended all his realty to be sold, the power of sale will be held imperative, and the doctrine of equitable conversion applied."

Probably that cannot be much improved upon if at all. If it has any infirmity, it is in not indicating the necessary degree of certainty with which the intention of the testator should be manifested in his will. In some jurisdictions it is said that the power of sale without an express direction will not work a conversion unless there is "an absolute necessity to sell to execute the will; or such a blending of the real and personal estate by the testator in his will as to clearly show that he intended to create a fund out of both real and personal estate, and to bequeath the said fund as money;" and that in either case the intent to convert will be deemed as conclusively indicated as if expressed in words, and the doctrine of equitable conversion will be applied. *Appeal of Hunt,* 105 Pa. St. 128. In *Hobson v. Hale,* 95 N. Y. 588, Justice MILLER, speaking for the court, said that the testator's desire to have his realty turned into personal property should be so certain as to leave no question in regard to it,

before the court should give effect thereto. The implication should be so strong as to leave no substantial doubt, was the rule stated in *Scholle v. Scholle,* 113 N. Y. 261, 21 N. E. 84. It should appear by necessary implication, was said in *Ford v. Ford,* 70 Wis. 19, 48, 33 N. W. 188. When the provisions of the will cannot be carried out without converting the realty into personalty, and the conditions are such that the testator must have contemplated that such conversion would take place to that end, were the words used in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345. From the foregoing we deduce this: When the execution of the scheme of the testator would be impossible, or attended with such difficulties that it would be unreasonable to suppose that its execution was contemplated by him, without the conversion of his real estate into personal property, a direction for such conversion will be deemed imperatively expressed in the will by necessary implication, to the same effect as if expressed in words; and the realty so directed to be converted will be deemed impressed with the character of personal property from the time of the death of the testator.

We must determine, by established rules for judicial construction more than by precedents, whether, in framing the sixth clause of his will, the testator purposed having the residue of his estate therein mentioned administered as personal property. Precedents help as regards the rules to be applied, but very little otherwise. It was truly said by Justice WILMOT, in *Keiley v. Fowler,* Wilm. Op. 319, that it will not do to tie to precedents in determining the meaning of a will:

"Every case stands upon the evidence of the testator's intention arising out of each will. In questions of intention, cases, unless they coincide in words and every other circumstance, never assist, but perplex the exposition. A will is the picture of a man's mind; and one may as well look at the picture of one man to know the person of another, as look at the will of one mind to know the mind of another."

In construing a will, the same as in construing any other
written instrument, the aim must be to read out of the lan-
guage thereof the purpose intended to be expressed therein,
so far as that can reasonably be done consistent with 'rules
of language and of law.  That is, to determine the intention
of the testator from the instrument itself, and to give effect
to it only so far as it can be found expressed therein with
reasonable clearness.  It is true, however, that courts take
greater liberties with the language of wills than with that of
other instruments.  And that is one of the reasons assigned
in the books for saying that precedents are less helpful in
enabling courts to correctly construe such instruments than
other writings.  *Swarthout v. Swarthout,* 111 Wis. 102, 86
N. W. 558.  The rules to be observed in reading the clause
before us, we assume, are too familiar to need to be more than
stated.  One of the most important of them is that a general
intent, clearly indicated, will control a particular intent.
Woerner, Administration, § 416.  Under that, mere details
prescribed in carrying out a manifest general purpose, that
are inconsistent therewith, must bend to harmonize with the
dominant idea of the testator.  A second rule of much im-
portance is this:  A construction that will render a will valid
will be adopted if within the boundaries of reason in view
of the language of the instrument, rather than one that will
render it invalid.  *In re Donges's Estate,* 103 Wis. 497, 79
N. W. 786; *Dennett v. Dennett,* 40 N. H. 498, 500; *Fussey
v. White,* 113 Ill. 637, 643; *Roe v. Vingut,* 117 N. Y. 204,
22 N. E. 933.  A third significant rule, in view of the facts
of this case, is this:  The state of the law, as understood at
the time of the execution of the will, should be considered.
Gray, Perpetuities, 633.  That consideration is of peculiar
significance when it is manifest, as here, that the work of
reducing the desires of the testator to testamentary form was
done with care, and by one especially fitted therefor by reason
of his legal attainments, and when the expressions used, and

general framework of the instrument, indicate a studied purpose to satisfy all legal essentials and avoid all dangers reasonably to be apprehended from unsettled questions of law. We should say in passing that it could not reasonably have escaped the attention of the person who drafted the will that the time the trust might continue was fatally long as to the real estate if the purpose was to have it administered as such, and that grave questions might arise respecting the validity of the trust as to the realty if the trustees were given merely an optional power of sale, and that this court, in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, had decided that there was no rule, statutory or otherwise, in this state, as regards perpetuities in the ownership of personal property, and no shadow of doubt had yet been cast upon that decision. A further important rule to be observed is that a construction should be adopted, if possible, that will give a sensible effect to all the words of the will. The use of rules at all, of course, for judicial construction, is legitimate only to solve some ambiguity in literal sense, or in the application of language to the subject with reference to which it is used.

In the light of the foregoing we will turn to the language to be construed, assuming without discussion that it is open to construction. The great bulk of the testator's property was disposed of under the sixth or residuary clause. It consisted mainly of real estate. There was upwards of half a million dollars in value of realty, and we may assume that much of it was non-income-paying property and was not susceptible of division and subdivision into many interests in severalty without converting the same into money. The executors were imperatively directed, "as soon as convenient" after the death of the testator, to divide what, in their judgment, would be equivalent to the residue of the estate, into four equal parts. It is manifest that the word "equivalent" was not used with the idea that the property was to be

divided *in specie,* but with the idea that the residuum of the
estate was to be estimated as soon as practicable, and divided
into four equal parts or shares, "as soon as convenient" after
the death of the testator, while the estate, as a whole, would
not be administered, so as to determine with exactness the
true amount of the residuary portion thereof, for a long time
thereafter. It is significant that the setting aside of the esti-
mated amount of the residuary estate, and dividing it into
four equal parts or shares to be thereafter administered as
four independent properties, was not to wait upon the result
of the general administration of the estate. It was to be done
at the earliest time that the executors could determine on a
sum, so to speak, that would, in their judgment, reasonably
stand for the residuary estate. How this first determination
and division of the residuary estate could be made with the
accuracy called for by the will without regarding it as a fund,
is not easy to understand from a business point of view. The
plan for the disposition of each of the two parts, shares, or
fourths, designed primarily for the testator's daughters, was
as follows: In one contingency it was to be divided into
three equal parts and one of such parts added to each of the
other fourths. On a second contingency it was to be divided
into two equal parts and one of them added to each of the two
portions of the residuary estate to which, in the circum-
stances mentioned, it would then be reduced. In a third con-
tingency it was to be added to the only other share of the
estate that would then be remaining in the circumstances
mentioned. In a fourth contingency it was to be divided
into two equal shares or parts, and one of them be divided
into two or three other equal shares or parts, or treated as an
entirety, according to circumstances named, and merged into
other portions of the trust estate, the other share to be ad-
ministered to the end of the trust term subject to a specified
contingency, upon the happening of which it was to be di-
vided into two or three equal parts or shares, or dealt with as

an entirety and merged into other independent parts of the
trust estate, according to circumstances specified. In the ab-
sence of the last contingency mentioned, the trust term as to
such minor share being at an end, it was to be subdivided
into certain specified equal portions or treated as an entirety
and paid over or conveyed to the person or persons mentioned,
according as the circumstances stated might require, or di-
vided into two or three equal parts or shares, or treated as
an entirety, according to circumstances mentioned, and
merged into other portions of the trust estate. It is con-
sidered that argument is unnecessary to demonstrate that the
execution of a plan contemplating such numerous divisions
and subdivisions of a great property into shares is practi-
cally impossible without treating it as a fund,—as a sum of
money. The words "pay or convey" and "dispose of" are
used many times in connection with the administration and
final disposition of the two major shares, primarily calcu-
lated for the testator's daughters; but we observe nothing in
their use inconsistent with the dominant purpose that the
property should be administered from beginning to end as a
fund,—as property that could be readily divided and subdi-
vided to meet any of the contingencies mentioned. Substan-
tially the same features as those we have mentioned as to
division and subdivision into shares, characterized the two
original shares directed to be set aside primarily for the
testator's sons. The idea of payment, as to such shares, is
dominant throughout. The words, "balance," "balance of"
said one-fourth," "aforesaid balance," "unpaid balance of
said one-fourth," "pay," and "payment," are used over and
over again. True, the word "convey" is also used, but where
that occurs in the provision for finally turning one half or
all of a share over to the person for whom it was primarily
set apart, ending the trust in respect thereto, it is in connec-
tion with the word "pay" and is followed by the words "such
payment," referring to the words "pay and convey," and in-

dicating that both such words were used with the single idea
of payment, thus:

"The entire balance of said one-fourth shall be paid over
or conveyed to my said son, *Fred F. Merrill,* five years after
the last *aforesaid payment* shall have been made, if in the
judgment of my said executors *such payment* would be
proper; but if his habits and mode of life at the expiration
of said five years are such as in the judgment of my said
executors will render *such payment* unsafe or improper, then
they shall withhold the same until they shall deem *such pay-
ment* prudent."

Such significant use of the word "payment," which ordi-
narily conveys the idea of the movement of money or of some-
thing near akin thereto, as securities of some kind, has uni-
formly been regarded as indicating a purpose that realty
shall be administered as personalty. In some cases it has
been regarded as controlling. *Dodge v. Williams,* 46 Wis.
70, 96, 1 N. W. 92, 50 N. W. 1103; *Clarke v. Clarke,* 46 S.
C. 230, 24 S. E. 202; *Webster v. Morris,* 66 Wis. 366, 28
N. W. 353; *Going v. Emery,* 16 Pick. 107; *Delafield v. Bar-
low,* 107 N. Y. 535, 539, 14 N. E. 498; *Salisbury v. Slade,*
160 N. Y. 278, 287, 54 N. E. 741. On the whole it appears
to us that the sixth clause of the will satisfies the test laid
down in *Dodge v. Williams, supra,* as regards equitable con-
version, and also the much more severe test required by other
authorities to which we have referred. It would be imprac-
ticable to carry out the testator's plan without treating the
residuary estate as money. There were serious dangers to
be apprehended at the time the will was drawn, in tying up
the estate as was done, in any other view than that it was
to be treated as money. The details of the plan in all par-
ticulars are consistent with the idea that four separate funds
were to be created out of the residuary estate and adminis-
tered and disposed of as such. Some of the most significant
details are inconsistent with any other theory than that they
refer to personal property in the form of money or securities

of some kind. The trustees have, from the first, construed the will in harmony with these views, as appears from the fact that they have converted most of the real estate into personal property. All the reasonable probabilities are in favor of the view that the desire of the testator was that the residuum of his estate should be treated as money. That makes a plain case for the application of the doctrine of equitable conversion.

While, as we have said, precedents are not very valuable in a case of this kind, we think those found here in principle justify our conclusion. *Appeal of Chandler,* 34 Wis. 505; *Dodge v. Williams,* 46 Wis. 70, 50 N. W. 1103, 1 N. W. 92; *Gould v. Taylor Orphan Asylum,* 46 Wis. 106, 50 N. W. 422; *Ford v. Ford,* 70 Wis. 19, 33 N. W. 188; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345. The precedents that might be cited from other courts are too numerous to warrant any attempt to do more than to refer to a few of the more important of them particularly applicable to the facts of this case. *Phelps's Ex'r v. Pond,* 23 N. Y. 69; *Delafield v. Barlow,* 107 N. Y. 535, 14 N. E. 498; *Salisbury v. Slade,* 160 N. Y. 278, 54 N. E. 741; *Asche v. Asche,* 113 N. Y. 232, 21 N. E. 70; *Clarke v. Clarke,* 46 S. C. 230, 24 S. E. 202; *Power v. Cassidy,* 54 How. Pr. 4; *Vanness's Ex'rs v. Jacobus,* 17 N. J. Eq. 153; *Forsyth v. Forsyth,* 46 N. J. Eq. 400, 19 Atl. 119; *Appeal of Dundas,* 64 Pa. St. 325; *Green v. Johnson,* 4 Bush, 164; *Appeal of Paist* (Pa.) 17 Atl. 6; *In re Marshall's Estate,* 147 Pa. St. 77, 23 Atl. 391; *Davenport v. Kirkland,* 156 Ill. 169, 40 N. E. 304; *Fahnestock v. Fahnestock,* 152 Pa. St. 56, 25 Atl. 313; *Phelps v. Phelps,* 28 Barb. 121; *Morse v. Morse,* 85 N. Y. 53. In *Phelps v. Phelps,* 28 Barb. 121, the controlling feature of the will was the necessity, at the expiration of ten years, to "divide up" the residue of the estate, consisting largely of realty, into as many "equal shares" as the testator might then have children and grandchildren, the probable number of such shares being

upwards of twenty, the intention being, in the words of the
testator, that "each child and grandchild shall be placed upon
an equal footing as to such residue, and each child and grand-
child receive one equal share of my residuary estate upon
such division as aforesaid." Looking at that feature, and
the full power of sale, discretionary in terms, contained in
the will, the court held that a purpose to bequeath the residu-
ary estate as money was clearly expressed. In *Delafield v.
Barlow,* 107 N. Y. 535, 14 N. E. 498, the will contained a
power of sale and provided for dividing the residuary estate,
consisting of both real and personal property, into two "equal
parts," then for dividing one of such parts into "four equal
parts," each of such parts to be held in trust for ultimate
division, possibly into many other equal parts, and "paid,
transferred and delivered" to as many different persons in
severalty, and for dividing the other half into "four equal
parts," one to be paid to each of the testator's children. The
court held that the discretion vested in the executors respect-
ing the sale of property, related to the time of actually con-
verting realty into personalty; that otherwise it was clearly
mandatory, as the execution of the will made a distribution
of the residuary estate as personal property a matter of ne-
cessity. In *Salisbury v. Slade,* 160 N. Y. 278, 54 N. E. 741,
decided by the court of appeals of New York in 1899, the
will contained the same features, in all essential particulars,
as those to which we have just referred, and those in this case.
In deciding the case the court used this decisive language:

"It seems too clear to require argument that the provisions
for the children raise of necessity an implied trust to sell.
. . . It was impossible for the executors and trustees to
carry out the provisions of this will without selling the prop-
erty."

*In re Marshall's Estate,* 147 Pa. St. 77, 23 Atl. 391, de-
cided by the supreme court of Pennsylvania in 1892, and
other cases to which we have referred, are of the same de-

cisive character, though in no one of them, we venture to say, did the will include so clearly a testamentary purpose to dispose of the property as personalty as the one in controversy in this case.

Does the sixth clause of the will offend against any law of this state as to perpetuities respecting personal property? We have seen in the discussion of the proposition respecting whether it unduly suspends the absolute power of alienation of realty, that the statute on that subject cannot be invoked to limit, primarily, or incidentally, power to tie up a fund derived from the sale of realty; and that if it were otherwise, the statute would not apply, because the trust property was, as we have seen, from the death of the testator, impressed with the character of personalty. Counsel for appellant contend that even in that view the trust is invalid because, though we have no statute on the subject, the common law is in force here, and condemns the trust because it involves possible interests that may not vest till after the termination of the period allowed by such rule. The conclusion which we have reached, as to whether the trust offends against such common-law rule, which will be hereafter stated, would enable us to fully dispose of this case without deciding the proposition suggested at the head of this paragraph; but if there be any doubt as to how it ought to be decided, it is considered that the subject is of such vast importance to the state that this court ought not to be responsible for permitting that doubt to continue longer. If there is one thing more than any other, respecting property rights, which the court should firmly establish so far as responsibility therefor rests with it, and carefully guard against changes and uncertainties by judicial decisions or *dicta,* or *obiter* remarks in judicial decisions, it is the system governing title to property; and yet we are confronted with the suggestion, in this fifty-fourth year of our judicial history, that there is such serious doubt, as to whether the common-law rule as to perpetuities respect-

ing personal property exists in this state, as to call for a judicial consideration of the matter; and we are in no position to say that such suggestion is wholly without warrant. Here is a legitimate occasion for putting such doubt as may exist on the subject at rest, and no want of judicial courage should allow it to pass unimproved merely because the way is open to decide the case and leave untouched the uncertainty created, we may say, by a passing judicial suggestion made here many years ago and since repeated. So we will decide the proposition submitted, and base our final conclusion, in part, thereon.

In *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, decided in 1879, it was at least proper to decide whether the common law as to perpetuities respecting personal property was in force in this state. A conclusion in regard thereto was reached and duly promulgated. It was one of the grounds upon which the judgment of the court was pronounced. There is no legitimate reason, that we can perceive, by a careful study of the case, for referring to what the court said on that occasion as mere *obiter* or as anything less significant than its deliberate judgment. That, as between the parties to the litigation, the decision on that point was *res judicata* by all rules on that subject, seems clear. It cannot properly be said that the conclusion of a court upon a minor point is mere judicial *dicta* because the ultimate decision arrived at might have been bottomed upon some other minor conclusion or conclusions also reached in the case. Otherwise, obviously, it would be easy to avoid the effect, as regards judicial rules, of the most solemn decision of the court in any case when supported by more than one independent and sufficient ground. The general rule is that every proposition assumed or decided, leading up to the final conclusion reached in a case, and upon which such conclusion is based, whether it be the sole or only one of several independent and sufficient grounds for such final conclusion, is

as effectually passed upon as the ultimate question solved. *Case v. Hoffman,* 100 Wis. 334, 75 N. W. 945; *South Bend C. P. Co. v. George C. Cribb Co.* 105 Wis. 443, 81 N. W. 675; *School Trustees v. Stocker,* 42 N. J. Law, 115; Wells, Res. Adjud. § 217. Now in *Dodge v. Williams,* with the question, as stated, up for decision, RYAN, C. J., speaking for the whole court, said:

"The statute limiting the rule against perpetuities to realty, manifestly abrogates the English doctrine as applicable to personalty."

Language could not well be plainer than that. In editing the case for the official reports of the decisions of the court, the headnote to the case was written as follows:

"Our statutes prohibiting perpetuities and regulating uses and trusts are expressly limited to realty; and the English doctrine as to perpetuity as applicable to personalty was thus abrogated."

No reference to the subject was made in any decision after *Dodge v. Williams* until *De Wolf v. Lawson,* 61 Wis. 469, 21 N. W. 615, decided in 1884, where COLE, C. J.,—the subject of legal restraint upon the absolute ownership of personal property not being involved—said, his remarks, we may properly say, being, for the reason stated, plainly *obiter:*

"The late distinguished chief justice observed in *Dodge v. Williams,* 46 Wis. 96, 50 N. W. 1106, that these provisions, limiting the rule against perpetuities to realty, manifestly abrogate the English doctrine as applicable to personalty. There can be no question but the statute refers to real estate alone. It may, however, admit of doubt whether the remark of the chief justice is strictly accurate in saying that it abolishes the common rule of perpetuities as to personalty when applied to private trusts."

Further along in the opinion the *obiter* character of the quoted remark is indicated by the following:

"This common rule of perpetuity as to personalty may be unaffected by our statute. However that may be, the above clauses of the will plainly refer to real estate."

It will be noticed that the decision of the court in the former case was referred to as if, instead of being, what it seems clearly to be, the judgment of the court, it was the mere observation or passing *obiter* remark of the chief justice. If such were its real character, it could be well neutralized by a contrary passing remark or observation of the same character; but as it received the indorsement of the court, as before stated, as its solemn conclusion upon a point up for decision, such conclusion must be regarded as the law of the state, too firmly entrenched to be more than clouded by the subsequent inaccurate reference thereto as the mere observation of Chief Justice RYAN. The next time the subject was spoken of was in *Webster v. Morris,* 66 Wis. 366, 28 N. W. 353, decided in 1886. There the statement in *Dodge v. Williams* was again mentioned as the mere "expression of the late chief justice," that idea being apparently carried forward from the similar remark in *De Wolf v. Lawson,* 61 Wis. 469, 21 N. W. 615. It was repeated without any accompanying suggestion indicating whether the expression "of the late chief justice" was or was not to be regarded as overruled by the expression of Chief Justice COLE. In fact, *Dodge v. Williams* was left by the *Webster Case* substantially where it was left by *De Wolf v. Lawson,* though, we should say in passing, the court in the former had a more legitimate opportunity to remove the cloud cast upon the early decision, or reverse it, than in the latter. The next time the subject was referred to was in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, decided in 1900. There, what was said in the early case was mentioned, in effect, as the statement of reasons for the final conclusion in such case, it being stated, historically, that the case was referred to in *De Wolf v. Lawson* as indicated, and the reference noticed in *Webster v. Morris* without adding to its significance on the point involved in the *Harrington Case.* No opportunity existed in the latter case

to consider the subject as one for decision. What was said was merely incidental to the vital questions there under discussion.

Now we have gone over the history in this state of the subject of whether we have the common-law rule as to perpetuities respecting personalty, and have seen that, instead of a mere passing remark or individual expression of opinion by the chief justice in *Dodge v. Williams,* on the subject, we have the deliberate judgment of the court, establishing the law for this state. It has stood as so established, though somewhat clouded, it is true, by intimations indicating that the way was open for a reconsideration of the matter, without change for twenty-three years,—long enough to be regarded as a rule of property and safe from danger of change except by legislative enactment. Whether the decision was right or wrong, to disturb it now by mere judicial power would be a far greater mistake than the making thereof, if it were clearly erroneous. When such a question has been so long settled as to have become firmly impressed upon property, the maxim, *Stare decisis, et non quieta movere,* should be regarded as a governing principle in respect thereto. *Harrington v. Pier,* 105 Wis. 493, 82 N. W. 345.

That textwriters should have fallen into some confusion respecting the situation in this state, on the subject above discussed, is not to be wondered at. In 18 Am. & Eng. Ency. of Law (1st ed.) 379, it is said that the rule against perpetuities has been held to be abolished in Wisconsin so far as it relates to personalty, citing *Dodge v. Williams* and *De Wolf v. Lawson.* In 2 Woerner, Administration, § 427, it is said that there is no statute in Wisconsin on the subject of perpetuities respecting personal property, and in mentioning the states where the common-law rule prevails on the subject, Wisconsin is not mentioned. In Gray's work on Perpetuities, in the note to sec. 266, the statement is made that the rule against perpetuities prevails in Wisconsin, no authority being

cited to support such statement, though in close connection therewith *Dodge v. Williams* is cited to the point that the statutory limitation upon the power to suspend the absolute power of alienation does not apply to a trust term in realty with a discretion to convert the same into personal property.

Neither by the foregoing conclusion, nor by anything said in reaching it, do we intend, expressly or inferentially, to give any opinion as to whether the correct conclusion was reached in *Dodge v. Williams*. That case may not have been correctly decided. There were good reasons, perhaps, for saying that it was not, when the *De Wolf Case* was decided; but it seems that it was an inadvertence to refer to what was said as the "observation" of the justice who wrote the opinion, and possibly not the law. In states having a statutory situation similar to ours, it has been held that the common law is in force. It is by no means improbable that, if we were permitted to deal with the subject as an original matter, we would so hold. The question was new when it was decided here. It had not, therefore, been considered, so far as we are able to find, in any jurisdiction, under conditions similar to ours. We have come to the conclusion, upon the most careful consideration of the matter, that whether it was here decided right or wrong, the decision has remained undisturbed so long that it ought to be given the force of a statute, leaving any change of policy that may be desired to be effected by the legislature.

If the conclusion were different as to the last subject discussed, the final result would be the same, because the next proposition submitted must be answered favorably to the respondents. This is the proposition: If the trust were to be tested by the common-law rule as to perpetuities, would it fail? That depends upon whether the twenty-one years of the rule is a gross term and an existing period of gestation, or whether the term refers to and is limited by existing infancy. There can be no reasonable controversy at this late

day, it would seem, but that the prevailing idea in the home of the common law, at the time it came to us, was that the term was a certain period of twenty-one years and the period of gestation added, though the rule was not distinctly formulated and settled in the English courts till *Cadell v. Palmer,* 1 Cl. & F. 372; *S. C.* 10 Bing. 140. As we understand it, that decision, since it was promulgated, has been accepted both in England and in this country, not only as to what the law of England is, but what it was when we took therefrom the principles of the common law. We venture to say that no decision of any importance can be found to the contrary of this. Counsel for appellants have not cited any to our attention, and we have been unable to find any. Substantially all textwriters (we may except one) and courts have unhesitatingly accepted *Cadell v. Palmer,* as having correctly formulated the common-law rule, and have followed it in the compilation of their works. Professor Gray, in his work on Perpetuities (sec. 186), though inclined to a contrary view as to the true rule, says that *Cadell v. Palmer* closed all controversy in England, and no question ever seems to have been made in America of the propriety of allowing a gross term. In *Toms v. Williams,* 41 Mich. 552, 2 N. W. 814, the court said:

"Under the old law alienation might be suspended for any number of lives in being and twenty-one years, and of course for twenty-one years as a distinct period independent of lives. This was settled in *Cadell v. Palmer,* 1 Cl. & F. 372; *S. C.* 10 Bing. 140. This decision was not made until several years after the adoption of the New York Revised Statutes, although its principle was previously regarded as generally received."

That remark is borne out by *Barnitz v. Casey,* 7 Cranch, 456, 469; *Odell v. Odell,* 10 Allen, 1, 5. See, also, *Chilcott v. Hart,* 23 Colo. 40, 45 Pac. 391; *Rhoads v. Rhoads,* 43 Ill. 239; *Waldo v. Cummings,* 45 Ill. 421. The entire roll of the elementary writers, with one exception, might be success-

fully called as evidence of the recognized soundness of *Cadell v. Palmer.* We will mention a few of them: Woerner, Administration, § 427; Rice, Real Prop. 758; 18 Am. & Eng. Ency. of Law (1st ed.) 340; Kerr, Real Prop. § 1129; Perry, Trusts, § 379; 1 Powell, Dev. (19 Law Lib.) 389, note; Lewis, Perpetuities, 140–162; 1 Washb. Real Prop. (5th ed.) 293; Burton, Real Prop. 269. A study of those authorities must convince any one, it would seem, that the twenty-one years of the common law is an absolute term; that *Cadell v. Palmer* did not promulgate any new rule, but only brought into clear light the law as it had existed from as early as 1766, at least, and that it has stood since without any challenge of consequence. One has but to follow the discussion of the subject in Professor Gray's work, to discover, notwithstanding his dissent as to the correctness of the English decision, that the principle thereof was recognized in the English courts long before the American Revolution. Throughout his lengthy discussion he fails to cite an English case decided since 1833 inconsistent with *Cadell v. Palmer* or any such case decided in this country at any time.

Notwithstanding suggestions to the contrary, we are unable to read out of the trust clause any possible contingency that can arise that will suspend the absolute vesting of any part of the trust estate beyond twenty-one years from the termination of lives in being at the death of the testator. The plan of the will clearly is that the trust shall, at the end of such period, absolutely terminate, and the absolute title to the entire property pass from the trustees to persons then ascertainable.

"To come within the rule of the common law against perpetuities the estate . . . must be one which, according to the terms of the grant or devise, is to vest upon the happening of a contingency which may by possibility not take place within a life or lives in being (treating a child in its mother's womb as in being) and twenty-one years afterwards." *McArthur v. Scott,* 113 U. S. 340, 381.

That is, one the vesting of which is made dependent upon an event limited to happen within a period not too remote. *Webster v. Morris,* 66 Wis. 366, 383, 28 N. W. 353. No infirmity of that kind is discovered here. The idea advanced by counsel is that the provisions of the trust clause, requiring the trustees to "pay over," etc., *at the expiration of twenty-one years* after the termination of lives in being, expressly prohibits the vesting of the absolute right to the property till some appreciable time after the termination of the twenty-one year term. Perhaps we do not appreciate the force of counsel's reasoning on that point. We certainly cannot understand the language of the clause as they seem to understand it. They argue as if it were to the effect that payment shall be made only after the expiration of the term mentioned, when the language plainly is that it shall be made *at the expiration* of such term. That obviously does not put off the vesting of the estate in the ultimate beneficiaries to a period subsequent to the termination of twenty-one years. That being so, the reasonable construction of the language is that all interests are to vest absolutely within the period. The law will not take notice of a time that is neither within nor without the period mentioned in the trust. Moreover, the time for paying over must necessarily be subsequent to the time of vesting. In any view one takes of the language, no infirmity is perceived.

It is suggested that the persons who will be entitled to the trust estate, from the necessities of the case, cannot be ascertained till a time subsequent to the termination of the twenty-one year period, and that such feature of the trust condemns it by the common-law rule against perpetuities. We are not familiar with any authority for the proposition that the identity of all the persons entitled to participate in the distribution of a trust estate must be ascertained within the time limited by such rule. If the vesting of the estate cannot, by the terms of the trust, be postponed to a period too remote,

that satisfies the rule. It does not involve, necessarily, the time when property vests in possession, but when the right vests. The contingency upon which that depends must happen, as has been indicated, within lives in being and the stated time thereafter. That being satisfied, the dependent estate vests instantly, though possession be deferred to a subsequent time. To avoid confusion on this subject one must keep clearly in mind that the rule against perpetuities differs from the rule against restraint upon alienation, and that it does not apply to vested interests at all. There must be contingencies upon which the vesting depends, or we have no use for the rule against perpetuities. If the right seasonably vests, postponement of the enjoyment does not offend against the rule. *Scott v. West,* 63 Wis. 565, 24 N. W. 161, 25 N. W. 18; *Webster v. Morris,* 66 Wis. 366, 383, 28 N. W. 353; *In re Johnston's Estate,* 185 Pa. St. 179, 39 Atl. 879; *Madison v. Larmon,* 170 Ill. 65, 48 N. E. 556; Gray, Perpetuities, §§ 117, 205, 321; Page, Wills, 728.

A further suggestion is made that the trust does not satisfy sec. 2071, Stats. 1898, in that it is not fully expressed and clearly defined upon the face of the instrument. Suffice it to say, on that point, that we have carefully considered counsel's argument and are unable to see the uncertainties suggested. That is not uncertain which may readily be made certain by some definite test provided in the trust when the time shall have arrived for action. That simple proposition seems to amply answer all the suggestions made in support of this point.

We have now discussed all of the more important questions submitted for consideration, including several, as indicated, that might have been omitted but which it was deemed best not to pass over, since a legitimate occasion was presented for deciding them, and the decision thereof seemed important to the end that the judicial policy of the state may be definitely known regarding property rights. The trust clause of the

will being found in every respect valid, and valid from any point of view that can reasonably be taken of the same, the complaint and answer based upon the contrary idea must be held insufficient and the demurrers thereto properly sustained, and the orders appealed from must be affirmed, and the cause be remanded for further proceedings according to law.

*By the Court.*—So ordered.

The following opinion was filed July 5, 1902:

Cassoday, C. J. I fully concur in the affirmance of the several orders from which the appeals are taken. The will expressly gave full power at all times to sell and convey the real estate and any part thereof, and to convert the same into personal property. The general scheme and purpose of the will is in harmony with its express language, and by necessary implication requires the real estate to be converted into personal property and to be administered and finally disposed of as such. Under the well-established doctrine of equitable conversion which this court has repeatedly recognized and enforced, the whole estate in question must, for the purpose of determining the validity of the will, be regarded, in equity, as personal property—as abundantly shown in the opinion of my brother Marshall, filed herein. This being so, it is very obvious that our statutes, which were in force at the time of the death of the testator, and which prohibited the suspension of the absolute power of alienation of real estate for a longer period than "the continuance of two lives in being at the creation of the estate," have no application to the estate in question. Secs. 2038, 2039, R. S. 1878. Such statutory prohibitions relate entirely to real estate and have no reference to personal estate.

The most important question in the case is whether the provisions of the will are repugnant to the common-law rule against perpetuities as to personal property. That rule was

necessarily evolved, little by little, from time to time, as questions arose in the courts. The important question running through the cases is as to the length of time that the absolute power of alienation might be suspended. In some of the early ·cases the suspension was limited to a single life in being when the estate was created. *Manning's Case,* 4 Coke, R. 329 (94b); *Lampet's Case,* 5 Coke, 328 (46b). But as early as 1674 Lord Chancellor NOTTINGHAM,—the father of equity,— after having granted a rehearing, called to his aid a number ·of able judges, and after due deliberation declared it to be the law:

"That the limitation of a term to several persons in remainder, one after the other, if such persons be all in being and particularly named, can in no wise tend to the entail of a chattel or creating of a perpetuity, but the limiting of it to a 'person not in being doth." *Goring v. Bickerstaffe,* Poll. 31, 32.

That is believed to be the first case extending the rule to a number of lives in being at the time of the creation of the ·estate. Soon after, the same learned Lord Chancellor followed the same ruling in the *Duke of Norfolk's Case,* Poll. 223; 3 Cas. Ch. 1; 2 Freem. 72. To the same effect: *Love v. Windham,* 2 Keb. 637; *Love v. Wyndham,* 1 Mod. 50; *Taylor v. Biddall,* 2 Mod. 289. Several of the cases cited were decided nearly 100 years before Blackstone was written. That standard work declared, nearly 150 years ago, that:

"Courts of justice will not indulge even wills, so as to ·create a perpetuity, which the law abhors; because by perpetuities (or the settlement of an interest, which shall go in the succession prescribed, without any power of alienation), estates are made incapable of answering those ends of social ·commerce, and providing for the sudden contingencies of private life, for which property was at first established. The utmost length that has been hitherto allowed for the contingency of an executory devise of either kind to happen in is that of a life *or lives in being,* and one and twenty years afterwards. . . . That though such remainders may be lim-

ited to as many persons successively as the devisor thinks proper, yet they must all be *in esse* during the life of the first devisee; for then all the candles are lighted and are consuming together, and the ultimate remainder is in reality only to that remainderman who happens to survive the rest; and it was also settled that such remainder may not be limited to take effect, unless upon such contingency as must happen, if at all, during the life of the first devisee." 2 Cooley, Bl. Comm. (4th ed.) 174, 175.

This was expressly approved and substantially held by the House of Lords, with Lord Chancellor BROUGHAM presiding, in *Cadell v. Palmer*, 1 Clark & F. 372, 411–423; 7 Bligh, 202, 229–240; 21 Eng. Rul. Cas. 100, 120–129. Mr. Perry states the several advances made in the common law. 1 Perry, Trusts (4th ed.) § 379. The case of *Cadell v. Palmer, supra,* was decided long before this state was admitted into the Union, and is referred to in the opinion filed herein as correctly stating the common law against perpetuities; and it is therein argued at great length, and, as I understand, in effect held, that the will in question does not offend against such common-law rule; and I fully concur in that construction of the will.

I have briefly referred to the history of the rule as bearing upon a question about to be considered. Had my brethren been content to rest the decision in this case upon such conclusion, there would have been no occasion for writing this separate opinion. But they have gone further, and expressly declared that: "The common-law rule as to perpetuities respecting personal property is not in force in this state." In other words, the declaration is that in Wisconsin personal estate may become inalienable and tied up for all time. And yet, as declared in the quotation from Blackstone, the law abhors perpetuities as being contrary to the purpose "for which property was at first established." Infringements of the common-law rule against perpetuities have uniformly been held void on the ground that they are "repugnant to the policy

of the law." *Duke of Norfolk's Case,* Poll. 226. Or, as approvingly quoted by Mr. Perry from the same case: "A perpetuity is a thing odious in the law, and destructive to the commonwealth; it would stop commerce and prevent the circulation of property." 1 Perry, Trusts (4th ed.) § 377. It requires no citation of authority to show that, except as changed by statute or constitution, the common law is in force in Wisconsin the same as the other states of the Union except Louisiana. *Coburn v. Harvey,* 18 Wis. 147; *Kellogg v. C. & N. W. R. Co.* 26 Wis. 272; *Spaulding v. C. & N. W. R. Co.* 30 Wis. 116; *Brown v. Kayser,* 60 Wis. 7, 18 N. W. 523, and cases there cited; *Webster v. Morris,* 66 Wis. 390, 391, 28 N. W. 353; *State v. Twogood,* 7 Iowa, 252; *Hemmingway v. Scales,* 42 Miss. 1. Certainly, the common-law rule against perpetuities was not changed prior to the adoption of our state constitution. That expressly declared that:

"Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state, until altered or suspended by the legislature." Sec. 13, art. XIV.

There is no pretense that there has ever been any statute in this state purporting to change such common-law rule as to personal property. The ruling in this case upon the question here being considered is based wholly upon an assertion of Ryan, C. J., in *Dodge v. Williams,* 46 Wis. 96, 50 N. W. 1106. He there states that:

"The statute limiting the rule against perpetuities to realty manifestly abrogates the English doctrine as applicable to personalty. *Expressio unius, exclusio alterius.*"

There are several reasons why that assertion should not be given the force of law: (1) No authority is cited by the learned chief justice in support of it. No authority is cited in support of it in the lengthy opinion filed in this case unless the quotation of it, without protest by way of argument by my brother Marshall, speaking for the majority of the court in *Harrington v. Pier,* 105 Wis. 507, 82 N. W. 345, is to be

regarded as an authority. (2) The assertion is not a sound proposition of law. In *Dodge v. Williams,* 46 Wis. 95, 1 N. W. 92, 50 N. W. 1106, the chief justice correctly states, what has already been indicated in this opinion, that: "The English doctrine of perpetuities applied to estates both real and personal, and grew up by a series of judicial decisions." In support of it he cites the two sections of Perry above mentioned. While the limitation upon the period of suspension of the power of alienation might be similar as to both classes of property, yet the common-law rules applicable to real estate were, in several respects, different from those applicable to personal estate. 1 Thom. Coke, Litt. 402, 403, note. This sufficiently appears from the authorities cited. As stated by Mr. Gray: "The rules of law and equity with regard to trusts were wholly abrogated in New York by the Revised Statutes of 1828, which now govern the entire subject." Gray, Restraint on Alienation of Property, § 180. Thus, one chapter of the statutes of that state is entitled, "Of Real Property, and of the Nature, Qualities, and Alienation of Estates Therein." Part 2, ch. 1, 1 R. S. of N. Y. pp. 665–701. Secs. 2038, 2039, R. S. 1878 (secs. 14, 15, ch. 56, R. S. 1849), discussed at length in the opinion on file in this case, are literal copies of sections 14, 15, of article 1 of title 2 of chapter 1, pt. 2, of the New York statutes, except that the last section of the New York statute reads, "not more than two lives," while our corresponding section simply reads "two lives,"—a distinction without a difference. Numerous other sections of the New York statutes relating to real estate were adopted by our Revised Statutes of 1849, and have been continued since. Chapter 4 of part 2 of the New York statute is headed, "Of Title to Personal Property, in Certain Cases." Id. p. 715. Sections 1 and 2 of title 4 of that chapter read:

"SECTION 1. The absolute ownership of personal property shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance and

until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition; or if such instrument be a will, for not more than two lives in being at the death of the testator.

"SECTION 2. In all other respects, limitations of future or contingent interests in personal property, shall be subject to the rules prescribed in the first chapter of this act, in relation to future estates in lands." Id. p. 727.

Thus, it appears that the legislature of this state simply adopted certain sections of the New York statutes limiting the rule against perpetuities as to real estate, but made no reference to such New York statutes as to personal property,— much less as to the common-law rule against perpetuities as to personal estate. In adopting the sections mentioned they were not legislating in respect to the common law, but in respect to existing statutory law. This being so, how is it possible that the maxim, *Expressio unius est exclusio alterius*—mentioned by the learned chief justice—operated to "abrogate the English doctrine" of perpetuities "as applicable to personalty"? As stated by an eminent English judge, that maxim

"is often a valuable servant, but a dangerous master to follow in the construction of statutes or documents. The *exclusio* is often the result of inadvertence or accident, and the maxim ought not to be applied when its application, having regard to the subject matter to which it is to be applied, leads to inconsistency or injustice." *Colquhoun v. Brooks,* 21 Q. B. Div. 52, 65.

To hold that the adoption of a statute of New York which materially shortened the common-law period during which the absolute power of alienation of real estate might be suspended, operated, by virtue of that maxim, to "abrogate the English doctrine" of perpetuities as to personal property, is, to my mind, simply absurd. The claim that such shortening of the period of suspension as to real estate operated to lengthen the time during which the absolute power of alienation of personal property might be suspended indefinitely and

to the remotest period would be the carrying of the doctrine of repeal by implication beyond all bounds; and that to secure a condition of things which, as we have seen, is "repugnant to the policy of the law" and "destructive to the commonwealth" and the purposes "for which property was at first established."

In each of our sister states of Minnesota and Michigan, the legislature adopted the New York statute as to real estate, mentioned, but not as to personal property, the same as was done in this state by the Revised Statutes of 1849. The question here being considered was squarely presented for adjudication in each of those states. The Minnesota court expressly held that:

"In this state the absolute power of alienation, as respects real estate, cannot be lawfully suspended by the creation of a trust for more than two lives in being. But as to personal property the common-law rule still prevails, and a trust therein may continue for one or more lives in being at the death of a testator, and twenty-one years and a fraction." *In re Tower's Estate,* 49 Minn. 371, 52 N. W. 27.

The same conclusion was reached by the supreme court of Michigan. *Palms v. Palms,* 68 Mich. 355, 363, 370, 36 N. W. 419, 434. On this last page it is said by the court that:

"The personal property coming within the trusts is governed in this state by the common-law rule, which limits the suspension of the power of alienation to the period of any life or lives in being and twenty-one years afterwards."

If these two decisions are right in the particular mentioned, then the assertion of Chief Justice Ryan, quoted, is wholly without foundation. That they are right, I apprehend, will not be disputed by any one who appreciates that the adoption of a particular statute simply displaces the common law to the extent that it is inconsistent with it. *Chippewa Falls v. Hopkins,* 109 Wis. 616, 617, 85 N. W. 553.

If a contrary rule, like the one announced in the opinion filed, is to prevail, then many of the decisions of this and other

courts, purporting to be based upon the common law, would
be without foundation. The difference in the statutes of New·
York and in this state, in the particulars mentioned, in a case
involving the right to assign the income of personal property,
was pointed out in *Lamberton v. Pereles,* 87 Wis. 449, 457,
458, 58 N. W. 776., That case is not referred to in the
opinion of my brother MARSHALL in this case. But the hold-
ing of my brethren upon this particular question is not based
upon the theory that the assertion of the chief justice, quoted,
is a correct proposition of law. On the contrary, and in
speaking of that particular assertion, the opinion of my
brother MARSHALL in this case expressly declares that:

"Neither by the foregoing conclusion, nor by anything said
in reaching it, do we intend, expressly or inferentially, to give
any opinion as to whether the correct conclusion was reached
in *Dodge v. Williams.* That case may not have been correctly
decided. There were good reasons, perhaps, for saying that
it was not, when the *De Wolf Case* was decided. In states
having a statutory situation similar to ours, it has been held
that the common law is in force. It is by no means improb-
able that, if we were permitted to deal with the subject as an
original matter, we would so hold." But the decision,
whether right or wrong, ought now "to be given the force of a
statute."

Thus it is, in effect, admitted that the assertion of the
learned chief justice was wrong and without any foundation,
and for that reason, in my judgment, it ought not to be sanc-
tioned,—much less "to be given the force of a statute."

"This is not a mere question of practice nor the construction
of a local statute long acquiesced in, but is a question of
general equity jurisprudence; and it is very important to the
people of the state that this court should, at least on such
questions, adhere to the principles of the common law so well
established as to become elementary." *Nonotuck Silk Co. v.
Flanders,* 87 Wis. 243, 244, 58 N. W. 383.

Courts are instituted, not for the purpose of making laws,
but for the purpose of declaring what the law is; and an

erroneous declaration, as to what the law is, does not, in my judgment, change the law, although it is binding upon the parties in the particular case. Such erroneous declaration of the law simply puts the court making it out of harmony with the law. Courts and judges, however learned and eminent, will from time to time make mistakes and erroneous statements in respect to the law, which should, when subsequently discovered, be corrected. In no other way can the high standard of the common law, declared centuries ago, be maintained.

"Reason is the life of the law; nay the common law itself is nothing else but reason, which is to be understood of an artificial perfection of reason, gotten by long study, observation, and experience, and not of every man's natural reason; for *nemo nascitur artifex.* This legal reason *est summa ratio.* . . . No man (out of his own private reason) ought to be wiser than the law, which is the perfection of reason. . . . The reason of the law is the life of the law; for though a man can tell the law, yet, if he know not the reason thereof, he shall soon forget his superficial knowledge." 1 Thom. Coke, Litt. 1, 3.

But there is still another reason why the assertion of the chief justice should not have the force of law. It was, in my judgment, uncalled for in the case in which it was made, and was mere *extra*-judicial *dicta.* This appears from the language of the chief justice in that case, where he said:

"The English doctrine of perpetuities . . . appears to have been applied to private trusts, but not to trusts for charitable uses, which usually are essentially and indefinitely permanent. The rule of public policy which forbids estates to be indefinitely inalienable in the hands of individuals *does not apply to charities.* These, being established for objects of public, general, and lasting benefit, are allowed by the law to be as permanent as any human institution can be, and courts will readily infer an intention in the donor that they should be perpetual. . . . If an alienation of the estate becomes essential to the beneficial administration of the charity, it may be authorized by a court of chancery. . . .

*But, were this otherwise,* the statute limiting the rule against perpetuities to realty manifestly abrogates the English doctrine as applicable to personalty." *Dodge v. Williams,* 46 Wis. 95, 96, 50 N. W. 1103.

That case was decided upon the theory that the bequest was for a charitable purpose and outside of the common-law rule of perpetuities. Thus it was said by my brother MARSHALL, in a recent case, that:

"It was plainly and correctly decided, in *Dodge v. Williams,* that the statutes of perpetuities and of uses and trusts have no application to gifts for charitable purposes. *That was as far as the court was called upon to go on the facts in that case."* *Harrington v. Pier,* 105 Wis. 493, 494, 82 N. W. 345.

Besides, in my judgment, the court is not called upon to decide in this case whether the common-law rule as to perpetuities respecting personal property is in force in this state. This seems to be conceded in the opinion of my brother MARSHALL, where it is said, in effect, that: "The conclusion which we have reached, as to whether the trust offends against such common-law rule, . . . would enable us to fully dispose of this case without deciding the proposition [just mentioned]." And again: "If the conclusion were different as to" that proposition, "the final result would be the same, because . . . if the trust were to be tested by the common-law rule, as to perpetuities," it would not fail. In the effort to give the assertion of the chief justice, quoted, "the force of a statute," it is claimed that that assertion is *res adjudicata.* In support of such claim, the opinion filed cites a case which holds that:

"A proposition assumed or decided by the court to be true, *and which must be so assumed or decided,* in order to establish another proposition, which expresses the conclusion of the court, is as effectually passed upon and settled in that court as the very matter directly decided." *School Trustees v. Stocker,* 42 N. J. Law, 115.

I have no objection to the rule thus stated, but in my judgment the assertion of Chief Justice Ryan does not come within that rule, but is entirely outside of it. The same is true as to the rule stated in the text-book cited in the opinion, where it is said that:

"It has been held that not only is the judgment of a court conclusive on all questions actually and formally litigated, but likewise as to all questions *within the issue,* whether formally litigated or not; that is to say, all matters which are *impliedly* and *necessarily within the issue* joined, and the determination of which is *necessarily* included in the judgment." Wells, Res Adjud. § 217.

This sufficiently appears from what has already been said. Chief Justice Marshall tersely stated the true rule when he said "that the positive authority of a decision is co-extensive *only* with the facts on which it is made." *Ogden v. Saunders,* 12 Wheat. 333; *Evans v. Virgin,* 72 Wis. 423, 39 N. W. 864.

4. There is one other reason why the assertion in question should not be given the force of law. Five years after that assertion was made, in an opinion by Cole, C. J., speaking for the whole court, four members of which participated in the decision of *Dodge v. Williams,* he stated the common-law rule of perpetuities as to personal property when applied to private trusts, and among other things said: "This common-law rule of perpetuity as to personalty may be unaffected by our statute." *De Wolf v. Lawson,* 61 Wis. 469, 473, 474, 21 N. W. 615. That was said after careful deliberation, in a case relating wholly to real estate, for the very purpose of preventing any one from being misled by such *obiter* remark of Chief Justice Ryan. The same was in substance repeated two years afterwards for the same purpose. *Webster v. Morris,* 66 Wis. 382, 28 N. W. 353. What was said in those two cases, and subsequently in *Lamberton v. Pereles,* 87 Wis. 449, 457, 458, 58 N. W. 776, I had assumed, substantially disposed of the *obiter* remark of Chief Justice Ryan in *Dodge v. Williams.* I had reached that conclusion because

I had supposed it to be a universal rule, as held by the supreme court of the United States, that a decision of any court "not in harmony with some of its previous decisions has the effect to overrule those with which it is in conflict, whether mentioned and commented on or not." *Asher v. Texas,* 128 U. S. 129.

While I have no doubt that my brethren have made the ruling here complained of, in pursuance of a sense of duty nevertheless I have been constrained to write this separate opinion, in which I have attempted, in a respectful manner, to expose what I regard as a legal monstrosity, in the hope that the legislature may do something to relieve the state of Wisconsin from being the only state in the Union where personal property may be given in trust for a private purpose and rendered inalienable for all time.

A motion to modify the judgment was denied September 23, 1902, and the following opinion was filed September 25, 1902:

MARSHALL, J.   We are asked to modify the judgment rendered here on these appeals so as to allow taxable costs in this court to the losing parties payable out of the trust fund. The prevailing parties, by their respective counsel, consent to the making of such modification, and yet we are unable to come to the conclusion that it can properly be done. A definite rule has been established as to when a trust fund, held by an executor, can be depleted in the manner here requested in the absence of a statute so regulating the matter. *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786. It is conceded that this action does not fall within the rule unless it should be viewed as one for the construction of a will. The court would not have gone so far as in the *Donges Case* had it not been for the previous decisions in respect to the subject, which we felt bound to follow. The whole practice

of inviting litigation by allowing parties to indulge in judi-
cial controversies involving trust funds at the expense thereof,
regardless of whether such parties win or lose, is pernicious
and should not be encouraged by any judicial rules. A care-
ful reading of the *Donges Case* must convince any one that
such was the view of this court when that case was decided.
That view has rather been strengthened than weakened by
efforts to have the rule declared by the court liberally con-
strued, minimizing its effects as regards the injustice it was
intended to prevent. All such efforts must fail. We incline
to a strict rather than a liberal construction of the rule. An
action not, strictly speaking, for the construction of a will
or contesting the validity of a will, though the meaning or
even the validity of a will may be the vital question involved,
does not fall within the rule. Otherwise, in an action of re-
plevin or trover, or any one of others that might be men-
tioned, if the right sought to be vindicated turned upon the
meaning or validity of a will, a party proceeding in good
faith, whether successful or not, would be entitled to have
his taxable costs out of the property involved. The mere
fact, it must be understood, that the validity of a will or its
meaning is a vital question in a case, is not sufficient to sat-
isfy the rule giving to a losing party in this court the right
to have his taxable costs paid out of the trust fund. The
cases to which counsel have called our attention where the
*Donges Case* was referred to as the ruling authority, were
will contest or construction cases. Such was *Jones v. Rob-
erts,* 96 Wis. 427, 70 N. W. 685, 71 N. W. 883, and the other
cases referred to in the *Donges Case,* which, it was supposed,
bound the court to declare the law to be as indicated in the
latter case.

Notwithstanding the conclusion reached as to whether this
case is one for the construction of or to set a will aside,
strictly speaking, we have the proposition before us on the
stipulation for the granting of the motions, as to whether a

trustee or guardian *ad litem* can make an agreement, entitled to be respected by the court by the entry of a judgment in accordance therewith, for the payment of costs out of the trust funds he is in duty bound to protect, which are not legitimately chargeable thereto. That must be answered in the negative. It has been in effect so decided as to guardians *ad litem* on many occasions. *Kingsbury v. Buckner,* 134 U. S. 650, 10 Sup. Ct. 638; *Fischer v. Fischer,* 54 Ill. 231; *Walton v. Coulson,* 1 McLean, 120, Fed. Cas. No. 17,132; *McClure v. Farthing,* 51 Mo. 109; *San Fernando F. H. Asso. v. Porter,* 58 Cal. 81; *Barber v. Graves,* 18 Vt. 290. Obviously, a trustee has no better right to give away the property he is in duty bound to conserve than a guardian *ad litem.* He has no right whatever to deal with the fund inconsistent with the purposes of the trust. The general principle in that regard clearly precludes a trustee or guardian *ad litem* from rightly stipulating for the payment of costs out of the trust fund under his care, which are not legitimately a charge upon it. The eminent counsel who signed the stipulation before us, of course, were not unmindful of such general and salutary principle. We construe their consent to the granting of the motions as merely so consenting in case of its being the judgment of the court, under the rule of the *Donges Case,* that the losing parties here are entitled to the relief they ask for.

*By the Court.*—The motions are denied.